[S.F. No. 23168. In Bank. Sept. 19, 1975.]

LOWELL RAY JOHNSON, Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**250**

## Counsel

Michael J. Barkett, Jr., for Petitioner.

No appearance for Respondent..

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Marjory Winston Parker, Robert D. Marshall and Kevin M. Corrington, Deputy Attorneys General, for Real Party in Interest.

## Opinion

**CLARK, J.**—Petitioner seeks writ of prohibition restraining respondent superior court from proceeding to trial by indictment charging him with conspiracy to commit and with commission of the crime of illegally transporting and selling a controlled substance (amphetamine tablets). (Pen. Code, § 182; Health & Saf. Code, § 11352.)

Prior to submission of the matter to the grand jury, petitioner's testimony at a preliminary hearing led the magistrate to dismiss a complaint charging him with the same offenses. The district attorney did not bring this testimony to the attention of the grand jury.

The reception and consideration of exculpatory evidence by the grand jury is governed by section 939.7 of the Penal Code. "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses."

■ Petitioner's testimony at the preliminary hearing did tend to "explain away" the charges against him, at least in the magistrate's opinion. Therefore, petitioner contends, the district attorney had an implied duty under section 939.7 to disclose this testimony to the grand jury. The People respond that the district attorney is not obligated to present exculpatory evidence to the grand jury unless the jury calls for it.

The People's response is disingenuous. The grand jury cannot be expected to call for evidence of which it is kept ignorant. When a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence. Such information having been withheld here, the writ of prohibition must issue.

*The Preliminary Hearing*

(a) Prosecution Testimony

On 31 July 1973, petitioner agreed to sell 200,000 amphetamine tablets to Mr. Logan, a federal undercover narcotics agent, and Mr. Young, Logan's informant. Petitioner told them the transaction would be consummated through Mr. Sherman because a pending court appearance caused petitioner concern. On three occasions in the preceding five weeks, agent Young had observed petitioner and Sherman in Mexico, negotiating to purchase amphetamine tablets.

On the evening of 7 August 1973, the transaction having been postponed once, Sherman telephoned Logan and Young in their hotel room in Stockton, arranging to meet them there. Twenty minutes later, petitioner drove up to Sherman's house in Lodi and Sherman came out to the car where they talked for five minutes. They then drove to Stockton in separate cars, petitioner leading the way. Sherman went to Logan and Young's room while petitioner circled the vicinity of the hotel for 15 to 20 minutes, finally parking within 200 yards of Sherman's car.

Sherman offered to sell Logan 50,000 amphetamine tablets for $3,000. Objecting that his agreement had been with petitioner, Logan told Sherman he wanted to know with whom he was dealing. Sherman replied that petitioner did not want to be directly involved because he had a prior conviction. When Logan pressed Sherman as to the ownership of the tablets, he replied, "They're borrowed but don't worry.

Me and Ray are partners." When the transaction was completed petitioner and Sherman were arrested.

### (b) Petitioner's Testimony

In March 1973, petitioner was charged with one count of selling restricted dangerous drugs and two counts of possessing such drugs for sale. At a pretrial conference in superior court, petitioner was informed that the district attorney would recommend a county jail sentence in return for cooperation in securing information concerning other narcotics dealers. Petitioner agreed and was told to work with Deputy District Attorney Saiers. When petitioner subsequently balked at appearing as a witness in prosecutions resulting from information he was to supply, Mr. Saiers warned him that he would go to prison unless he cooperated. Pursuant to a bargain struck with Mr. Saiers just before his court appearance on 6 August 1973, petitioner was permitted to plead guilty to one of the possession counts, the other two counts were dismissed, and the probation and sentence hearing was continued until 17 September 1973, to give petitioner more time to "produce."

Petitioner had never been in Mexico with Sherman. He did agree to sell amphetamine tablets to Young and Logan when they met on 31 July 1973, but did so with the intention of informing on them. He did not tell them the transaction would be consummated through Sherman. Petitioner had nothing to do with the transaction on 7 August 1973; he was in the area because he hoped to inform on Sherman.

### (c) Dismissal

The magistrate's role is limited by statute to determining whether or not there is sufficient cause to believe the defendant guilty of a public offense. (See Pen. Code, §§ 871, 872.) Within the framework of his limited role, however, the magistrate may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses. (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609]; *Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 667 [94 Cal.Rptr. 289, 483 P.2d 1241].) In dismissing the charges against petitioner, the magistrate —possibly influenced by the People's failure to call Deputy District Attorney Saiers, or anyone else, to rebut petitioner's testimony—resolved the conflicts in the evidence against the People.

## The Grand Jury Hearing

The People have chosen a poor vehicle for arguing that the district attorney is not obligated to present exculpatory evidence to the grand jury unless the jury calls for it. Not only did the district attorney fail to inform the grand jury of petitioner's preliminary hearing testimony, but he also created the false impression that petitioner would refuse to testify if called. At the conclusion of the grand jury hearing, after three other witnesses had testified in the interim, the district attorney recalled the arresting officer and elicited his testimony that, following arrest and advisement of his *Miranda* rights, petitioner had refused to make a statement upon the advice of counsel. Reference to petitioner's invocation of the privilege against self-incrimination was clear misconduct, as the Attorney General concedes. (*People* v. *Miller* (1966) 245 Cal.App.2d 112, 156 [53 Cal.Rptr. 720], disapproved on another ground in *People* v. *Doherty* (1967) 67 Cal.2d 9, 14-15 [59 Cal.Rptr. 857, 429 P.2d 177]; see *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People* v. *Modesto* (1967) 66 Cal.2d 695, 710-711 [59 Cal.Rptr. 124, 427 P.2d 788].) But more importantly, the grand jury's power to order the production of evidence which may "explain away" the charges under consideration was thereby thwarted.

## The Protective Role of the Grand Jury

"Under the ancient English system . . . . the most valuable function of the grand jury was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will." (*Hale* v. *Henkel* (1906) 201 U.S. 43, 59 [50 L.Ed. 652, 659, 26 S.Ct. 370], quoted in *Hoffman* v. *United States* (1951) 341 U.S. 479, 485 [95 L.Ed. 1118, 1123, 71 S.Ct. 814].)

■ The Fifth Amendment guarantee that a civilian may not be held to answer in a federal prosecution for a capital or otherwise infamous crime " 'unless on a presentment or indictment of a Grand Jury' " presupposes a grand jury " 'acting independently of either prosecuting attorney or judge,' whose mission is to clear the innocent, no less than to bring to trial those who may be guilty." (*United States* v. *Dionisio* (1973) 410 U.S. 1, 16-17 [35 L.Ed.2d 67, 81, 93 S.Ct. 764]; citation omitted.)

The grand jury's "historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor" (*United*

*States* v. *Dionisio, supra,* at p. 17 [35 L.Ed.2d at p. 81]) is as well-established in California as it is in the federal system. "If [exculpatory] evidence exists, and [the grand jury] have reason to believe that it is within their reach, they may request it to be produced, and for that purpose may order the district attorney to issue process for the witnesses ([former] § 920, Pen. Code), to the end that the citizen may be protected from the trouble, expense, and disgrace of being arraigned and tried in public on a criminal charge for which there is no sufficient cause. A grand jury should never forget that it sits as the great inquest between the State and the citizen, to make accusations only upon sufficient evidence of guilt, and to protect the citizen against unfounded accusation, whether from the government, from partisan passion, or private malice." (*In re Tyler* (1884) 64 Cal. 434, 437 [1 P. 884].)

The protective role traditionally played by the grand jury is reinforced in California by statute. The forerunner of section 939.7 was former section 920 of the Penal Code, the section cited in *In re Tyler, supra.* Section 920 provided: "The grand jury is not bound to hear evidence for the defendant; but it is their duty to weigh all the evidence submitted to them, and when they have reason to believe that other evidence within their reach will explain away the charge, they should order such evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses." (Enacted by Stats. 1871-1872, ch. 288, § 1, p. 391; repealed by Stats. 1959, ch. 501, § 1, p. 2443.) Section 920, in turn, was a word-for-word reenactment of a statute passed by the first session of our Legislature. (Stats. 1850, ch. 119, § 232, p. 292.)

The People contend the proper construction of section 939.7 is that "the impetus for the presentation of exculpatory evidence must originate in the grand jury, not the district attorney." However, unless so informed by the district attorney, the grand jury ordinarily has no "reason to believe that other evidence within its reach will explain away the charge." The defendant is not entitled to appear before the grand jury in person (*People* v. *Foster* (1926) 198 Cal. 112, 120 [243 P. 667]) or by counsel (*People* v. *Dale* (1947) 79 Cal.App.2d 370, 376 [179 P.2d 870]). The defendant's right to bring exculpatory evidence to the attention of the grand jury by letter (*In re Tyler, supra,* 64 Cal. at p. 437) is illusory unless he knows his case will be under consideration by them. Because the proceedings of the grand jury are held in secret without notice to the defendant, the construction of section 939.7 urged by the People would nullify its protective role. (See Witkin, Cal. Criminal Procedure, p. 167.)

### The District Attorney's Duty

■ "The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial . . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].) At trial—where the adversary system operates—the district attorney may discharge his duty by disclosing to the defendant the substantial material evidence favorable to him. (*People v. Ruthford* (1975) 14 Cal.3d 399 [121 Cal.Rptr. 261, 534 P.2d 1341].) The district attorney is not obligated to present such evidence at trial himself because it is defense counsel's duty to do so. (See *People* v. *Kiihoa* (1960) 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673].)

■ However, the adversary system does not extend to grand jury proceedings. As has been explained, if the district attorney does not bring exculpatory evidence to the attention of the grand jury, the jury is unlikely to learn of it. We hold, therefore, that when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced. Having disposed of this case on statutory grounds, we need not consider petitioner's alternative due process argument. We have considered the People's procedural objections and find them meritless.

The writ issues without prejudice to the district attorney's continuing to prosecute these charges by seeking another indictment, or by filing another complaint. (See *People* v. *Uhlemann* (1973) 9 Cal.3d 662, 666 [108 Cal.Rptr. 657, 511 P.2d 609].)

McComb, J., Tobriner, J., Sullivan, J., and Burke, J.,* concurred.

**MOSK, J.—**

I

I concur with the result reached by the majority and with the conclusion that the prosecution has a duty under Penal Code section 939.7 to inform the grand jury of the nature and existence of exculpatory evidence.

However, the majority propose a mere analgesic to ease the procedural pain instead of probing the need for substantive corrective surgery. In

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

my view, the majority's palliative measure does not eliminate our obligation to deal with constitutional considerations. Rather, I believe that the present case is a vivid illustration of the intrinsic constitutional infirmity in the grand jury's indicting function as presently exercised in California, an ailment which can be cured only by allowing every indicted defendant a post-indictment preliminary hearing as a matter of right.[1]

As I have intimated on another occasion (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 670, fn. 1 [108 Cal.Rptr. 657, 511 P.2d 609], dissenting opn.), it is my belief that prosecution by indictment under the present statutory scheme denies an accused fundamental rights at a critical stage of the criminal process and results in violations of equal protection and due process of law.

In California there are two widely disparate methods of initiating a felony prosecution: indictment and information. (Cal. Const., art. I, § 14.)[2] The choice, with no guiding standards in either statute or case law, is subject to the uninhibited strategy or whims of the district attorney. Both prosecutorial methods are ostensibly designed to insure there is probable cause to believe that a felony has been committed and that the accused is guilty of it before he is subjected to the rigors, the expense, the jeopardy, and the obloquy of a trial. But here the similarity ends. If prosecution is begun by information the accused immediately becomes entitled to an impressive array of procedural rights, including a preliminary hearing before a neutral and legally knowledgeable magistrate, representation by retained or appointed counsel, the confrontation and cross-examination of hostile witnesses, and the opportunity to personally appear and affirmatively present exculpatory evidence. (Pen. Code, § 858 et seq.; *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867 [59 Cal.Rptr. 440, 428 P.2d 304].)

---

[1]This opinion is exclusively concerned with the grand jury's indicting process and not with its investigative function (see Olson, The California Grand Jury: An Analysis and Evaluation of Its Watchdog Function (1966)), nor with questions relating to selection of its membership (see Mar, *California Grand Jury; Vestige of Aristocracy* (1970) 1 Pacific L.J. 36). The grand jury serves a valuable and productive role in the area of investigation, particularly with respect to governmental corruption or ineptitude. Its public reports to the citizenry serve a salutary governmental and educational purpose. (See my dissent in *People* v. *Superior Court (1973 Grand Jury)* (1975) 13 Cal.3d 430, 442 [119 Cal.Rptr. 193, 531 P.2d 761].) With regard to selection practices, there may lurk constitutional issues to be confronted in the future, but they are not presented in the case at bar.

[2]Article I, section 14, provides: "Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information."

By contrast, the indictment procedure is distinctive because of its deliberate omission of even minimal safeguards. Penal Code section 939.7 captures the spirit of the proceeding by declaring forthrightly that "The grand jury is not required to hear evidence for the defendant . . . ." Far from being allowed to be represented by counsel or to confront and cross-examine witnesses, the accused himself has no right to appear unless called by the prosecution and if he is called he is denied the presence of counsel. The proceedings are conducted in absolute secrecy, and in many cases the prospective indictee may not even be aware he is the subject of an inquiry. The members of the grand jury, constitutionally organized to provide a bulwark of objectivity between the citizen and the zealous prosecutor, are reduced to total reliance on the very public official whose potential excesses they are designed to check. In its raw state, the proceeding raises the spectre of the Star Chamber: the prosecution is able to "dry run" its case in secrecy, and the jurors are able to do little more than rubber stamp the recommendation of the district attorney. As I shall demonstrate, this disparity between the rights accorded defendants whose prosecutions are begun by indictment and those who are proceeded against by information raises grave issues of constitutional magnitude.[3]

## II

The history of the various modes of initiating prosecutions reveals that a current analogy to early discredited English practice is not mere hyperbole; it appears we have now come full circle and returned to the pre-Runnymede era when "le graunde inquest" was merely an agency of the crown. Most authorities date the origin of the grand jury to the Assize of Clarendon (1166) in the reign of Henry II. (2 Pollock & Maitland, The History of English Law (2d ed. 1909) p. 642 (hereinafter Pollock & Maitland); 1 Holdsworth, A History of English Law (1903) pp. 147-148 (hereinafter Holdsworth); 4 Blackstone, Commentaries, p. 301.) It was there provided that 12 knights or "good and lawful men" of every hundred and four were to declare under oath the identities of those in the community suspected of public offenses. All persons thus "presented" were then tried by ordeal (Edwards, The Grand Jury (1906) p. 7 (hereinafter Edwards)), a method undeniably more barbaric than the

---

[3]Recent commentary on the grand jury has been strongly critical. (See, e.g., Antell, *The Modern Grand Jury: Benighted Supergovernment* (1965) 51 A.B.A.J. 153; Comment, *Grand Jury Proceedings: The Prosecutor, The Trial Judge and Undue Influence* (1972) 39 U.Chi.L.Rev. 761; Comment, *Federal Grand Jury Investigation of Political Dissidents* (1972) 7 Harv. Civ. Rights-Civ. Lib. L.Rev. 432; see generally Lubbers, Annotated Bibliography on the Grand Jury (1973).)

present ordeal of trial. Failure to demonstrate innocence at the ordeal resulted in banishment and the loss of a hand and a foot; success at the ordeal was rewarded by mere banishment. (*Id.,* at p. 9.)[4]

"Slowly the character of the institution changed. Originally an important instrument of the Crown, it gradually became instead a strong independent power guarding the rights of the English people." (Younger, The People's Panel: The Grand Jury in the United States, 1634-1941 (1963) p. 2 (hereinafter Younger).) By 1352 the panel that accused no longer assumed responsibility for the trial itself, and the first seeds of the present bifurcated system of grand and petit jury were sown. (2 Pollock & Maitland, p. 649.) As the age of royal absolutism developed, this body of freemen became a singularly effective deterrent to politically motivated prosecution by the crown. The return by one famous grand jury of a bill of "ignoramus" in the attempted prosecution of the Earl of Shaftesbury in 1681 is frequently cited as demonstrating the evolution of the institution from a prosecutorial arm into an agency responsible for protecting the individual from officially sanctioned oppression.[5]

The establishment of British hegemony in the American colonies resulted in the exportation to our shores of British legal institutions, including the grand jury. While certain of the colonies, particularly the theocracies, altered the institution to conform to religious or social predilections, the colonists themselves continued to regard the grand jury as a fundamental feature of a civilized state. Thus when in 1683 the inhabitants of New York forced the Duke of York to permit the colonial assembly to pass a "Charter of Libertyes and Priviledges," there was included the protection "That in all Cases Capitall or Criminall there shall be a grand Inquest who shall first present the offence and then twelve men of the neighborhood to try the Offender who after his plea to the Indictment shall be allowed his reasonable Challenges." (1 Schwartz, The Bill of Rights: A Documentary History (1971) p. 383.)

[4]There is a technical difference between an indictment and a presentment. A presentment is an accusation made by the grand jury itself, flowing from the knowledge and personal observation of the members. An indictment comes to the grand jury as a charge from without, usually from a prosecutor or the king's officer, to which the grand jury either returns a true bill or a bill of "ignoramus."

[5]Thus Edwards states: "So far as we have considered it, we have found it to be an arm of the government, acting as a public prosecutor for the purpose of ferreting out all crime, the members of the inquest being at all times bound to inform the court either singly or collectively their reasons for arriving at their verdict and the evidence upon which it was based. The seed, however, had been sown in Bracton's time, which was destined to change the grand jury from a mere instrument of the crown to a strong independent power which stood steadfast between the crown and the people in the defence of the liberty of the citizen." (Edwards, p. 27.)

"By the end of the Colonial period the grand jury had become an indispensable part of government in each of the American colonies. Grand juries served as more than panels of public accusers. They acted as local representative assemblies ready to make known the wishes of the people. They proposed new laws, protested against abuses in government, and performed many administrative tasks. They wielded tremendous authority in their power to determine who should and who should not face trial. They enforced or refused to enforce laws as they saw fit and stood guard against indiscriminate prosecution by royal officials." (Younger, p. 26.)

It is thus clear that a functional revolution in the grand jury occurred in the six centuries between the Assize of Clarendon and the adoption of the Fifth Amendment to the United States Constitution. By the time of the latter, the institution had evolved to its purest form: a citizen's tribunal, set resolutely between the state and the individual. Unhappily, the contemporary grand jury no longer serves that historic role and has regressed to little more than a convenient prosecutorial tool.[6] In order to appreciate the change that has taken place since 1791 it is necessary to review the development of the parallel method of accusation: the criminal information.

Accusation by information was historically viewed with distrust, because originally it represented simply the prosecutor's naked charge which only in the last century has been checked by the development of the preliminary examination. This method of accusation is at least as old as the indictment and "came very naturally to the centralized royal justice of the thirteenth century." (Orfield, Criminal Procedure From Arrest to Appeal (1947) p. 194 (hereinafter Orfield).) Ironically, unlike the situation today, the criminal information was first seen as antagonistic to the right to indictment.[7]

By the end of the medieval period the unrestricted use of accusation without indictment had become so intolerable that it in practice became restricted to misdemeanors. (9 Holdsworth, p. 238; Orfield, p. 195.) But even this limitation proved inadequate, because it still enabled "all

---

[6]On those isolated occasions when grand jurors assert their independence, they are disparagingly referred to as "a runaway grand jury."

[7]Indeed even in the late 19th century this was still an open question in the United States. However, in *Hurtado* v. *California* (1884) 110 U.S. 516 [28 L.Ed. 232, 4 S.Ct. 111, 292], the Supreme Court, over the vigorous dissent of Justice Harlan, held that the due process clause of the Fourteenth Amendment did not require an indictment as a condition precedent to a state felony prosecution.

private persons to prosecute criminally any person who had offended them by any act which could be treated as a misdemeanor without the sanction of a grand jury." (1 Stephen, A History of the Criminal Law of England (1883) p. 296 (hereinafter Stephen).) In the 17th century numerous attempts were made to abolish the information entirely; although these efforts were unsuccessful, they did result in further procedural curbs. (Orfield, pp. 196-197.)

Today it is common knowledge that the vast majority of felony prosecutions in California are initiated by information rather than indictment. (Judicial Council of Cal., Annual Rep. (1974) p. 45.) This results, however, in no diminution of the rights of the accused because of the development of a procedural outgrowth of the information, the preliminary hearing.[8]

In its earliest form the preliminary examination, like the indictment and information, was an oppressive tool of the crown. Most authorities date the origin of the proceeding to the inquest made by the coroner after the discovery of a crime. (1 Stephen, p. 217; 4 Holdsworth, p. 529.) The proceeding was codified during the reign of Philip and Mary to give justices of the peace the power to conduct what amounted to a British form of inquisition. (1 & 2 Phil. & M., ch. 13 (1554); 2 & 3 Phil. & M., ch. 10 (1555).) Holdsworth condemned these statutes as permitting "an inquisitorial examination of the prisoner, not a judicial enquiry into the facts of the case. They gave, as they were designed to give, the executive some of the advantages against prisoners which were conferred by the inquisitorial procedure of foreign states; and it is not till the reforms of the last century that the examination lost its original character, and became an enquiry of a judicial nature. Such a procedure may seem strange to our modern ideas. But in the sixteenth century, it was necessary in order to secure the observance of the law and to protect the state against its enemies." (4 Holdsworth, p. 529.)

---

[8]The development of the preliminary hearing led to a movement to abolish the grand jury in the 1920's and early 1930's. A commission was established by President Hoover to inquire into the matter and its report, known as the "Wickersham Report," recommended that the grand jury be abolished. The basis for the report was two empirical surveys conducted by Professor Moley of Columbia University and Dean Wayne Morse of the University of Oregon. One of the principal findings of the surveys was that grand juries tend merely to rubber stamp the recommendation of the district attorney. (Moley, *The Initiation of Criminal Prosecutions by Indictment or Information* (1931) 29 Mich.L.Rev. 402; Morse, *A Survey of the Grand Jury System* (1931) 10 Ore.L.Rev. 101; but see Dession, *From Indictment to Information—Implications of the Shift* (1932) 42 Yale L.J. 163.)

The reforms Holdsworth spoke of occurred in 1848, when Parliament decreed that defendants at preliminary examinations have the right to counsel, the right to have witnesses examined in their presence, and the right to make statements and present exculpatory witnesses. (11 & 12 Vict., ch. 42.) The enactment of these and further safeguards created the anomalous situation that accusation by information, once the bane of English civil libertarians, became imbued with far more procedural safeguards than were available when prosecution began by indictment.

This anomaly persists to the present day, due primarily to the fact that the indicting function of the grand jury has not changed in character or procedure in centuries. By contrast, in England, the country of its origin, there is no longer a need to consider reforming the grand jury to comport with modern notions of justice and due process, because the British deemed the shortcomings of the whole grand jury system compelling enough to abolish the institution in 1933.[9]

By contrast, California clings steadfastly to the anachronistic rules of the discarded English past. As demonstrated by the facts of the case at bar, in this state there remains the legally tenable possibility that an individual may be compelled to undergo the trauma of a felony trial based on an ex parte proceeding from which he and all his evidence are statutorily excluded. Indeed it has taken us until the instant case to arrive at the point of recognizing that the prosecutor is under the modest duty to disclose to the grand jury the existence of exculpatory evidence of which he is aware. Yet in my view the indictment procedure remains constitutionally inadequate. Until the accused is given the right to demand a postindictment preliminary hearing there is no question but that he is being denied due process at a critical stage of the proceedings, and also that there is a violation of equal protection when the rights accorded an indicted defendant are compared with those of an individual whose prosecution is initiated by information.[10]

[9]Some writers contend that the abolition of the grand jury in England was an economic decision (Whyte, *Is The Grand Jury Necessary?* (1959) 45 Va.L.Rev. 461, 483; Younger, *The Grand Jury Under Attack* (1955) 46 J.Crim.L. 214, 217-220.) However, the reason for this economic decision was the fact that the grand jury's indicting function was no longer deemed necessary in view of the development of the information and preliminary examination. Similar sentiments were being voiced at the same time in the United States. (See fn. 8, *ante.*)

[10]The traditional response that the grand jury is per se constitutional because of its express mention in both the United States (U.S. Const., 5th Amend.) and California Constitutions (Cal. Const., art. I, § 14) is unpersuasive. Although both charters speak of the grand jury as an institution, neither delineates how the system is to be administered, these matters being legislatively and judicially mandated. It is not the *existence* of the

## III

In *Coleman* v. *Alabama* (1969) 399 U.S. 1 [26 L.Ed.2d 387, 90 S.Ct. 1999], the United States Supreme Court concluded that the preliminary hearing is a critical stage of the criminal process "at which the accused is 'as much entitled to such aid [of counsel] . . . as at the trial itself.' "(*Id.*, at p. 10 [26 L.Ed.2d at p. 397], quoting *Powell* v. *Alabama* (1932) 287 U.S. 45, 57 [77 L.Ed. 158, 164, 53 S.Ct. 55, 84 A.L.R. 527].) The Alabama preliminary hearing was far less "critical" than its California counterpart, because its sole purpose was to determine if there was sufficient evidence against the accused to justify bringing the case *before a grand jury.* Nevertheless the Supreme Court held the "guiding hand of counsel at the preliminary hearing is essential to protect the indigent accused against an erroneous or improper prosecution." (*Id.*, at p. 9 [26 L.Ed.2d at p. 397].)[11]

The conclusion is inescapable that if a *pre*indictment proceeding is a critical stage of the criminal justice process requiring due process safeguards, a fortiori the indictment proceeding itself is a critical stage. Indeed Chief Justice Burger, dissenting in *Coleman,* pointed out the "anomaly" of requiring counsel at a preliminary hearing when "counsel cannot attend a subsequent grand jury inquiry, even though witnesses, including the person eventually charged, may be interrogated in secret session." (*Id.*, at p. 25 [26 L.Ed.2d at pp. 405-406].) The chief justice openly wondered (*ibid.*) "how can this be reconciled" with the fact that "at the decidedly more 'critical' grand jury inquiry" there was no assistance of counsel.

The bald disparity between the rights afforded an accused at a preliminary hearing and those refused a defendant charged with an

---

grand jury which is at issue—that is constitutionally recognized; it is the *procedure,* not defined in either charter, which is conditionally inadequate.

[11]The court took pains to elaborate the reasons why counsel was necessary: "First, the lawyer's skilled examination and cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over. Second, in any event, the skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial. Third, trained counsel can more effectively discover the case the State has against his client and make possible the preparation of a proper defense to meet that case at the trial. Fourth, counsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail." (*Ibid.*) These same factors, of course, also dictate that indicted defendants receive a postindictment preliminary hearing, because in California at present these advantages are not granted to indicted defendants.

identical offense before the grand jury has led one writer to characterize the holding in *Coleman* as a "tantalizing tease": "One can imagine a prosecutor piously explaining to an accused: 'Yes, indeed, if you have a preliminary hearing, it is a critical stage of the prosecution and you are entitled to counsel. You will be able to cross-examine witnesses against you, present any testimony you wish to give, challenge whether probable cause has been established and obtain some discovery of the case against you—but, of course, that is if I permit you to have a preliminary hearing. If I choose to go directly to the grand jury, on the other hand, all these precious rights I just outlined for you are not available since you are not exposed to a critical stage of the prosecution but only to the grand jury which indicts you.' If the accused is a reader of Dickens, he will be compelled to reply: 'If the law (says) that . . . then the law is a ass . . . .' " (Dash, *The Indicting Grand Jury: A Critical Stage?* (1972) 10 Am. Crim.L.Rev. 807, 814-815.)

The term "anomaly" tends to become overworked when the grand jury's indicting function is under discussion, but one is continually struck by the fact that this proceeding remains untouched by the safeguards which have become firmly attached to points in the criminal process of far less significance. For example, it is now the law that a casual suspect at a lineup has more rights than an accused before a grand jury. (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926].) Similarly, a parolee charged simply with violation of conditions of his parole has the opportunity to personally appear, cross-examine hostile witnesses, and be conditionally represented by counsel at the revocation hearing (*Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593]; *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778 [36 L.Ed.2d 656, 93 S.Ct. 1756]), yet none of these protections is accorded to the potential indictee. Indeed, far more safeguards protect prison inmates at disciplinary hearings (*Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963]) and parole rescission hearings (*Gee* v. *Brown* (1975) 14 Cal.3d 571 [122 Cal.Rptr. 231, 536 P.2d 1017]) than are permitted free and presumptively innocent persons before the grand jury.

The traditional counterargument that the grand jury merely inquires into whether there is probable cause to bind the defendant over for trial, thus avoiding any need for due process safeguards, can no longer be considered valid after *Coleman, Morrissey* and their progeny. As noted, in *Coleman* the Alabama preliminary hearing determined only whether there was probable cause to present the case to the grand jury—not even whether there was probable cause to bind the defendant over for trial. ·

Nevertheless the Supreme Court held that the potential jeopardy to the defendant was significant enough to trigger the demands of due process.

An even more vivid illustration of the point is the recent recognition of the due process rights of parolees at the *pre*revocation hearing. *Morrissey* mandates two separate hearings prior to parole revocation, the first of which, the prerevocation hearing, is designed to determine only whether there is 'probable cause to believe the parolee has violated a condition of parole. (*Morrissey,* at pp. 484-487 of 408 U.S. [pp. 496-498 of 33 L.Ed.2d].) Yet in order to terminate the "conditional liberty" of the parolee the authorities must give notice of the time, place, and purpose of the prerevocation hearing and afford the parolee the opportunity "to appear and speak personally in his own behalf, and bring and present letters, documents and other persons who can give relevant information to the hearing officer. Adverse witnesses are to be made available for questioning by the parolee except when the hearing officer determines that an informant would be subject to risk of harm if his identity were disclosed. The hearing officer must make a summary or digest of the proceedings and must determine if there exists probable cause to hold the parolee for revocation proceedings against him." (*People* v. *Vickers* (1972) 8 Cal.3d 451, 456-457 [105 Cal.Rptr. 305, 503 P.2d 1313].)

It is therefore manifest that if due process requires these various procedural protections in order to determine probable cause to terminate conditional liberties, equal or greater safeguards must be observed in order to protect the absolute liberty of the prospective indictee. Here again we see the incongruous circumstance of a proceeding which is deemed constitutionally sufficient to indict but is inadequate to serve as a substitute for the prerevocation hearing: either the preliminary hearing or the trial itself may serve as the prerevocation hearing if a parolee charged with a new offense is given notice of the dual purpose of the proceeding (*In re Law* (1973) 10 Cal.3d 21 [109 Cal.Rptr. 573, 513 P.2d 621]); but the grand jury proceeding, because of its complete lack of the procedural rights mandated by *Morrissey,* may not be so substituted (*In re Valrie* (1974) 12 Cal.3d 139 [115 Cal.Rptr. 340, 524 P.2d 812]). In short, the present grand jury system does not even rise to the constitutional standards of parole prerevocation hearings.

In *Powell* v. *Alabama* (1932) 287 U.S. 45, 69 [77 L.Ed. 158, 170, 53 S.Ct. 55, 84 A.L.R. 527], the Supreme Court declared that a person accused of crime "required the guiding hand of counsel at every stage in the proceedings against him." If this were in fact the law this opinion

would be unnecessary, because it is irrefutable that the grand jury proceeding is a "stage," and indeed a critical stage, of the criminal justice process. Unfortunately, to date courts have been loathe to shine the revealing light of due process analysis into the secret recesses of the grand jury room. Because of this reticence, the state is permitted to subject an individual to the trauma of a felony trial without even cursory consideration of his side of the story. This, I submit, is a patent violation of the due process clauses of the federal and state Constitutions, rivaled only by its equally blatant violation of equal protection of the law.

## IV

Under traditional equal protection analysis it has now become axiomatic that persons similarly situated must receive like treatment under the law. (*In re Antazo* (1970) 3 Cal.3d 100, 110 [89 Cal.Rptr. 255, 473 P.2d 999].) If "fundamental rights" are not involved the state may justify classifications if they are reasonably related to a legitimate state goal. If fundamental rights or "suspect classifications" are involved the state bears the heavy burden of demonstrating a "compelling" interest. As stated in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], " 'in cases involving "suspect classifications" or touching on "fundamental interests," . . . the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " (*Id.,* at p. 597, quoting *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

In all criminal cases the district attorney, and by extension the state, makes a distinction between those defendants who will be prosecuted by indictment and those who will be prosecuted by information. One class of defendants receives a preliminary hearing with the attendant rights heretofore enumerated, while the other class receives no preliminary hearing and no procedural protections. The two classes are in all other respects identical and indeed, as the instant case demonstrates, embrace not only the same crimes but occasionally the same individual. The classification is not based on any state objective which may be considered legitimate, but rather is grounded on the arbitrary goal of

vesting in the People vast prosecutorial advantages which the grand jury system affords.[12]

Moreover, these classifications are not mere economic discriminations to which the rational relation test may be applied, but rather involve such fundamental rights as counsel, confrontation, the right to personally appear, the right to a hearing before a judicial officer, and the right to be free from unwarranted prosecution. These guarantees are expressly or impliedly grounded in both the state and federal Constitutions and must by any test be deemed "fundamental." Accordingly, as *Serrano* teaches, in order to justify such a selective denial of fundamental guarantees the state must show not only a compelling interest but also that the classifications are necessary to that end.

The goal of prosecutorial advantage could not, of course, be deemed "compelling." Indeed this goal could not even be termed "legitimate." But even assuming arguendo there is some heretofore unperceived purpose for initiating certain prosecutions by grand jury indictment which would satisfy the compelling interest test—an assumption that is extravagantly generous—it is nevertheless clear that the denial to these defendants of a postindictment preliminary hearing could not possibly be "necessary" to achieve that hypothetical goal.[13]

This court has on a number of occasions supplemented existing criminal or quasi-criminal procedures when the demands of equal protection warranted it. In *In re Gary W.* (1971) 5 Cal.3d 296 [96 Cal.Rptr. 1, 486 P.2d 1201], we determined that due process and equal protection required that a youth whose normal discharge date from the Youth Authority was deferred because of the authority's conclusion that he was dangerous to the public (Welf. & Inst. Code, §§ 1800-1803) was entitled to a jury trial on the issue of "dangerousness." We pointed out

[12]*People* v. *Uhlemann* (1973) *supra*, 9 Cal.3d 662, is illustrative of the advantage. At the preliminary hearing the defendant, through counsel, was able to discredit the prosecution witnesses as he confronted them. The experienced magistrate refused to hold the defendant for trial. Undaunted, the prosecutor went forum shopping and took the case before the grand jury, where, such matters being uncontested, it was readily predictable that an indictment would be returned. It was.

[13]It may be argued, for example, that in certain cases there is an overwhelming need for the secrecy which can be obtained only through the grand jury, either for the protection of witnesses or, in rare instances, for the protection of the defendant himself. (See *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121].) However, once an indictment is returned these considerations can no longer be considered operative, because whatever secrecy was achieved through the grand jury will be forsaken when the defendant is brought to trial. Thus there would appear to be no reason, postindictment, why the defendant could not be accorded a preliminary hearing.

that the Legislature had extended the right to trial by jury to other classes of persons subject to civil commitment and concluded there was no compelling state interest to support a distinction for this class of juveniles.

Similarly, in *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], we applied *Gary W.* and held that persons committed to a mental institution following an acquittal on a criminal charge by reason of insanity were entitled to a jury trial should they thereafter assert that they no longer constitute a danger to society. Most recently, in *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373], we considered "whether the state may constitutionally deny to persons committed under the mentally disordered sex offender law the right to a unanimous jury which it grants to persons committed under the [Lanterman-Petris-Short] Act." (*Id.,* at p. 352.) We found neither a rational basis nor a compelling interest to justify the classification, and accordingly held the scheme constituted a "wholesale denial of equal protection of the laws under both the California and federal Constitutions." (*Id.,* at p. 358.)[14]

For the foregoing reasons I am of the view that equal protection requires that all criminal defendants have the same opportunity to prove to a magistrate that there is no probable cause to bind them over for trial. "The purpose of the preliminary hearing is to weed out groundless or unsupported charges of grave offenses, and to relieve the accused of the degradation and the expense of a criminal trial. Many an unjustifiable prosecution is stopped at that point, where the lack of probable cause is clearly disclosed." (*Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 150 [114 P.2d 335, 135 A.L.R. 775].) A proceeding of such significance cannot, consistent with the constitutional mandate of equal protection, be selectively denied.

V

It may be argued that to afford an indicted defendant the right to demand a postindictment preliminary hearing would be a superfluous

---

[14]In *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], the Supreme Court responded to similar considerations in invalidating a New York statutory procedure which permitted involuntary commitment of prisoners nearing the end of their term upon a finding by the court that they were mentally ill. The high court pointed out that all other persons civilly committed in New York were given the right to a jury trial, and concluded, "the State, having made this substantial review proceeding generally available on this issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some." (*Id.,* at p. 111 [15 L.Ed.2d at p. 623]; see also *Jackson* v. *Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845]; *Humphrey* v. *Cady* (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048].)

formalism because the issue of probable cause had already been decided by the grand jury. However, the facts of the instant case provide an excellent demonstration of the potential value of such a postindictment hearing.

As the majority note, "Not only did the district attorney fail to inform the grand jury of petitioner's [prior] preliminary hearing testimony, but he also created the false impression that petitioner would refuse to testify if called." (*Ante,* p. 253.) It appears obvious that the district attorney was determined to initiate this prosecution in a forum that would preclude petitioner from testifying in his own behalf. If this tactic would be unavailing because of the defendant's right to a subsequent preliminary hearing, a prosecutor would have no incentive to engage in such devious gamesmanship. The safeguard of an available preliminary hearing is clearly preferable to the majority's proposal of depending upon this prosecutor—the same one who misrepresented petitioner's desire to testify and engaged in the "clear misconduct" of referring to petitioner's invocation of *Miranda*—to take the responsibility of protecting petitioner's rights by presenting the exculpatory evidence.

In addition to the likelihood that recognition of this right would preclude instances such as the case at bar from arising in the future, there is also a strong possibility that problems such as *Uhlemann* (see fn. 12, *ante*) henceforth will be avoided. While a rule requiring a postindictment preliminary hearing would not remove the incentive to forum shop among magistrates, it would remove any advantage to be gained from seeking an indictment. This would at least insure that the defendant is always given the opportunity to confront the witnesses against him, and, if he chooses, to present his own evidence through his own attorney. In factual contexts such as the case at bar such an opportunity might well provide the critical difference.

The alternative of leaving the grand jury structure in the posture here formulated by the majority is unsatisfactory for a number of reasons. First, under the majority's rule the prosecutor need inform the grand jury only of the existence and nature of exculpatory evidence *of which he is aware,* thus by obvious implication excluding from the grand jury's consideration evidence solely in the defendant's possession which might adequately explain away the charge. In the present case, had there not been a prior preliminary hearing it is likely the district attorney would have been unaware of petitioner's exculpatory evidence. Under the

majority's formulation, however, there would be no way in which petitioner could have halted this unwarranted prosecution prior to trial.

Secondly, the district attorney need not call the defendant to testify or even inform the grand jury of its statutory right to order the defendant or his evidence produced. Rather, the majority are content to leave it to the grand jury, *sua sponte,* to "exercise its power under the statute to order the evidence produced." (*Ante,* p. 256.) Thirdly, and perhaps most importantly, one may seriously question the enthusiasm and zeal that a prosecuting attorney seeking an indictment will bring to the task of presenting the accused's exculpatory evidence. I suggest that the proper person to present the accused's evidence is the accused through his attorney, and the proper forum is one which will permit the development not only of affirmative exculpatory evidence but also evidence gleaned from adequate cross-examination and confrontation of the state's witnesses.

The administrative burden of requiring preliminary hearings for all indicted defendants would be negligible. Some indicted defendants may choose to waive the subsequent preliminary hearing. But even if none do so, no court congestion will eventuate. The vast majority of felony prosecutions in California are begun by information with an attendant preliminary hearing. For example, in 1971 only 4.1 percent of the felony filings were prosecuted by indictment. (Alexander & Portman, *Grand Jury Indictment Versus Prosecution by Information—An Equal Protection-Due Process Issue* (1974) 25 Hastings L.J. 997, 1014.) To incorporate these few indicted defendants into the general administrative mainstream would obviously present no problem. Seldom are we given an opportunity to correct such a massive deprivation of rights by so minimal an effort.

We would not be the first court to recognize the necessity of requiring postindictment preliminary hearings. Recently the Supreme Court of Michigan, exercising the inherent power of the court over matters of criminal procedure, held that all indicted defendants are entitled to such examinations as a matter of right. By relying on inherent power the Michigan court avoided what was characterized as "serious questions of equal protection and due process . . . since [the present system] denies to an accused indicted by a multiple-man grand jury what has become recognized as a fundamental right in most criminal cases—the right to a preliminary examination." (*People* v. *Duncan* (1972) 388 Mich. 489 [201 N.W.2d 629, 635].)

While the pragmatic result obtained by the Michigan Supreme Court is sound, I would face the constitutional issues and hold instead that the due process and equal protection clauses of the state and federal Constitutions do require that all indicted defendants receive a postindictment preliminary examination.[15] Unless this very minimal safeguard is interposed between the state and the accused individual I fear the current grand jury procedure is constitutionally infirm. " '[T]en centuries of usage give a very striking respectability to any institution; and grand juries existed before the feudal law and have survived its extinction. They are perhaps the oldest of existing institutions; but if they are to continue, they must rest on their continuing utility, not on their antiquity, for future toleration.' "[16]

Wright, C. J., concurred.

**TOBRINER, J.**—As the concurring opinion of Justice Mosk suggests, the current application of the grand jury indictment function raises serious constitutional questions. In my view, however, a determination of such fundamental issues should properly await a case in which these questions have been directly raised and argued by the parties. Since that is not the case here, I express no opinion on the merits of these constitutional claims.

---

[15]The wording of the California Constitution does not preclude a postindictment probable cause hearing. Article I, section 14, provides that felonies shall be prosecuted "as provided by law." The term "law" of course embraces judicial rulings as well as legislative enactments. (Cf. Evid. Code, § 160.) Prior to the November 1974 streamlining of the state Constitution the wording of the section made plain that a post-indictment preliminary hearing was a considered possibility. At that time article I, section 8, provided: "Offenses heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, as may be prescribed by law." From the ballot arguments and opinion of the legislative analyst it is clear that no substantive changes in this section were intended by the 1974 amendment.

[16]*Edwards*, page 35.