[No. F036655. Fifth Dist. Sept. 10, 2002.]

THE PEOPLE, Plaintiff and Appellant, v.
WILLIAM ERNEST GNASS, Defendant and Respondent.

## COUNSEL

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Jo Graves, Assistant Attorney General, Stan Cross, Stephen G. Herndon and Brett H. Morgan, Deputy Attorneys General, for Plaintiff and Appellant.

Mason, Robbins, Gnass & Browning, Michael L. Mason and Ralph Temple for Defendant and Respondent.

## OPINION

**BUCKLEY, J.**—On December 9, 1999, the Stanislaus County Grand Jury returned an indictment charging William Ernest Gnass with 10 criminal violations of Government Code section 1090[1] in that he had a financial interest in each of 10 contracts he made in his official capacity as attorney for the City of Waterford (Waterford or the City). The contracts involved the issuance of bonds under the Marks-Roos Local Bond Pooling Act of 1985. (§ 6584 et seq.) Although neither the City nor the city attorney was a party to the contracts, the City received some of the bond proceeds, and Gnass was paid for legal services he provided as a private attorney in connection with the bond sales.

Gnass moved to set aside the indictment (Pen. Code, § 995) on the ground, among others, that the evidence presented to the grand jury failed to establish probable cause to believe his interest in the contracts was sufficient to bring him within the scope of section 1090. The trial court granted Gnass's motion and dismissed the indictment. The People have appealed.

We will conclude the evidence is sufficient to show that Gnass was "financially interested" in 10 joint powers agreements "made" by him in his

---

[1] Except as noted otherwise, all statutory citations refer to the Government Code.

"official capacity" as the city attorney, as those three terms are defined for purposes of section 1090. We will also conclude, however, that the district attorney's failure to instruct the jury on the mental state ("knowing" and "willful") necessary for a *criminal* conflict of interest under section 1097, in combination with other irregularities in the grand jury proceedings, was likely to have caused the grand jury to indict Gnass on less than reasonable or probable cause. We will therefore affirm the trial court's dismissal of the indictment.

## FACTUAL AND PROCEDURAL BACKGROUND

The following statement of facts is derived from the documentary evidence and testimony of witnesses presented to the grand jury by the district attorney. This included exculpatory materials presented at Gnass's request in accordance with Penal Code section 939.71 and *Johnson v. Superior Court* (1975) 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792] (the *Johnson* materials). As we discuss more fully below, the district attorney's opening and closing statements to the grand jury were not recorded, and so are not a part of the record on appeal. The record, however, does contain additional materials (such as those attached to Gnass's suppression motion) that were not presented to the grand jury. They help, in some cases, to explain the grand jury evidence, which tends toward the extremes of fragmentary or voluminous, and which is always rather technical. To the extent we utilize this additional evidence, we do so only for the sake of making the following history more comprehensible, and not (unlike the parties on appeal) as proof of any important fact. Nevertheless, as will become clear from the discussion below, the essential facts about Gnass's role in the bond issues are undisputed, and beyond that the details of any particular financing arrangement do little more than put his role into the proper context.

Gnass is an attorney and partner in the law firm of Flanagan, Mason, Robbins, Gnass & Corman (FMRGC). In 1989, the City hired FMRGC, and Gnass in particular, to act as the city attorney. The City agreed to pay Gnass a monthly retainer of $1,500 in exchange for legal services up to 15 hours a month, and $100 per hour for his additional time beyond that. This agreement presumably was still in effect during the period Gnass was alleged to have had a conflict of interest, i.e., from 1995 through 1997.

In 1990, the City entered into a joint powers agreement with its redevelopment agency to create the Waterford Public Financing Authority (the Authority or Waterford PFA). The purpose of the Authority was to issue bonds to fund capital improvement projects within the City. The City Council of Waterford also served as the board of the Waterford PFA, and

Gnass served as the Authority's attorney. Although the City and the Authority were separate legal entities, it often happened that the council would adjourn its meeting and then promptly reconvene as the Authority board. It is not clear from the record what agreement, if any, Gnass had with the Authority regarding payment for his services.

The Waterford PFA issued $12 million in bonds soon after it was formed, but one or more of the projects funded by the bond proceeds eventually encountered financial difficulties that pushed the City to the verge of bankruptcy when it was unable to service the debt. About this time, in 1995, the City was approached with an offer to raise money by forming a joint powers agency (JPA) to issue so-called roving Marks-Roos bonds. There is some dispute about whether it was Gnass or someone else who first proposed this idea to the City.

The Marks-Roos Local Bond Pooling Act (§ 6584 et seq.) permits two or more local public agencies to enter into a joint powers agreement for the purpose of issuing revenue bonds to fund "any" capital improvement that will provide a "significant public benefit." (§§ 6586, 6588; see generally *Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1050-1052 [77 Cal.Rptr.2d 189, 959 P.2d 347].) The Waterford PFA, as distinct from the City of Waterford, would eventually participate in six such JPA's, which, in turn, issued 11 series of revenue bonds between December of 1995 and July of 1997. It was in connection with these bond issues that the indictment alleged Gnass had a conflict of interest. (Two of the bond issues were treated as one for purposes of count 10 of the indictment.)

Generally, the financing arrangements worked like this: The Waterford PFA and one or more other public agencies joined together to form a JPA, which was termed a "public financing authority" (PFA). (We therefore refer to this JPA generically as a "Marks-Roos PFA" to distinguish it from the Waterford PFA, which was only one member of the larger group.)

The Marks-Roos PFA issued revenue bonds (or some similar type of debt instrument) paying a relatively high rate of interest, which in many cases was exempt from state and federal taxes. The bond proceeds then were used to fund projects such as golf courses, housing developments, and casinos to be built by private developers. The projects typically were located some considerable distance away from the agencies that issued the bonds, and so these financing arrangements were known as "roving JPA's." (See Parkin, *Out of Bounds: A Response to Abuse of the Marks-Roos Local Bond Pooling Act of 1985* (1999) 30 McGeorge L.Rev. 723.)

The revenue these projects was expected to generate upon completion was committed to pay the bondholders, whose investment was otherwise secured

by the developer's property, and not by the participating public agencies (§ 6551). Each of the parties to the Marks-Roos PFA, including the Waterford PFA, was paid an "administrative fee" for lending its name (i.e., its capacity to issue tax-exempt bonds) to the project. The amount of the fee was based on a percentage of the face value of the bonds. Beyond this, the public agencies had little to do with the development projects they helped to finance.[2]

All the participants in these financing arrangements had an attorney: the public agencies making up the Marks-Roos PFA, the Marks-Roos PFA itself, the developer, the underwriter (Pacific Genesis Group, Inc.), and the trustee. In addition, there was a bond counsel whose job it was to review the legal aspects of the bond issue, and a disclosure counsel who evaluated the financial risks of the development project and prepared a prospectus for potential buyers. The bond counsel and the disclosure counsel both worked for the Marks-Roos PFA. (Often, the PFA's counsel also served as the bond counsel.)

The Marks-Roos PFA, as a legal entity separate from the public agencies that formed it, had its own board of directors. The board was the same in many cases as the governing board or council of one of the constituent public agencies. That is, the city council members of Waterford, who were also the board members of the Waterford PFA, might in addition serve as the board of the Marks-Roos PFA. Conversely, they might not have any seats on

[2]This practice of paying "administrative fees" to the participating public agencies for little more than the use of their names would soon become a subject of considerable controversy. The City's finance director, Gary Whitfield, learned of the controversy late in 1996, when he was given a few articles about it from some municipal bond magazines. He passed the articles along to Gnass and the members of the city council and Waterford PFA.

In December of 1996, Whitfield received a letter about the fees from the Attorney General's Office, which was investigating one of the bond issues in which the Waterford PFA had participated (the Malibu Canyon PFA). Referring to an informal opinion by the Attorney General, which had been issued the previous August in response to an inquiry by the state Treasurer, the letter stated: "We concluded in the opinion that a joint powers authority (hereafter 'JPA') may not use the proceeds of a Marks-Roos bond issue to pay fees to members of the authority, if the payments have no direct relationship to the administrative costs incurred by the JPA member as part of the bond issue or to construction of the public improvements financed by the bonds. We also concluded that the fees must be commensurate with the costs that are actually incurred by the JPA member."

The letter therefore requested the Waterford PFA provide it with an assortment of documents related to the bond issue and the PFA's costs incurred in connection with it. Whitfield, with the help of Gnass, prepared and sent a response to this request.

Because of this controversy, the City or the Waterford PFA (Whitfield could not remember which) decided not to participate in any new Marks-Roos PFA's, but to complete the ones in which it was already involved.

The district attorney offered the Attorney General's letter to the grand jury for the nonhearsay purpose of explaining Whitfield's motivation in sending the response.

the board. Or the board might consist of representatives from some or all of the constituent agencies, and might also include the developer and/or a member of the public.

Gnass, as we have already mentioned, was the attorney for both the City and the Waterford PFA. He also served as disclosure counsel for each of the bond issues, or was paid for services he provided to the one other person hired as disclosure counsel. Angil Patricia Morris (later Judge Morris-Jones of the Merced County Superior Court) was disclosure counsel for all the bond issues for which Gnass was not. Before going into private practice, both had worked together at the Merced County Counsel's Office, where Gnass was Morris's boss. Morris, who was a sole practitioner in Fresno when she served as disclosure counsel, paid half her fee to Gnass's firm, FMRGC, for the use of its staff and facilities, and for legal consultations with Gnass and another attorney at the firm.

The process by which all this occurred, and Gnass's role in it, if any, is unclear. The record does not explain, for example, how the various public agencies came together to form the Marks-Roos PFA; how the Marks-Roos PFA came in turn to form an alliance with a private developer; how it was decided who would serve on the board of the Marks-Roos PFA; and how the decision was made by the board to select a particular person to serve as the disclosure counsel.

With this general outline in mind, we briefly will describe two of the Marks-Roos PFA's that serve to illustrate this financing arrangement.

The *Sierra-Central Valley PFA* (SCVPFA) was created in 1995 by the Waterford PFA, the City of Isleton, and the Picayune Rancheria of the Chukchansi Indian Tribe (Tribe). The seven members of the rancheria's tribal council also served as the board members of the SCVPFA.

The SCVPFA issued three series of revenue notes in 1995. The tax-exempt series A notes had a face value of $8.2 million, which the SCVPFA would loan to the Tribe. According to the prospectus, the Tribe, in turn, would use the money to acquire land (in the name of the SCVPFA) from the developer of a proposed subdivision in southern Madera County known as River Bend Ranches. The subdivision, covering some 400 acres, was planned to include an 18-hole golf course, 263 residential lots, and a 60-unit planned unit development. The land to be acquired by the Tribe was committed to open space, ponding basins, and utility easements in association with the subdivision.

The proceeds from the taxable series B notes, in the amount of $6.795 million, was to be loaned by the SCVPFA to the Tribe, and then by the Tribe

to the developer, for construction of the golf course. The taxable series C notes, in the amount of $1.4 million, was to be loaned to the Tribe to purchase some 80 acres of land within its tribal territory in Madera County, upon which the Tribe planned to build a casino.

The Waterford PFA received administrative fees from the proceeds of the series A, B, and C notes in the amounts of $41,000, $43,875, and $18,000, respectively.

Angil Morris served as disclosure counsel for the SCVPFA series A and B notes, for which she evidently was paid a total of $55,000. She presumably split this amount equally with Gnass. Gnass was disclosure counsel for the SCVPFA series C notes, for which he was paid $10,000.

Gnass's receipt of these payments in connection with the SCVPFA series A, B, and C notes formed the basis for counts 1, 2, and 3 of the indictment, respectively.

The Waterford PFA formed the *California Desert PFA* (CDPFA) in 1996, along with one or more of the following entities (depending on which of the PFA's three bond issues was involved): the Merced County Board of Education, the Pacific Rim Economic Development Corporation, and Shoalwater Bay Indian Tribe of Washington.

There were three people on the board of directors of the CDPFA. They were the same three people (at least initially) who made up the board of the Pacific Rim Economic Development Corporation, and included one representative (E. L. Davis) of the Waterford PFA. The CDPFA bond prospectus stated: "The Authority has no independent staff and consequently will be dependent upon the Waterford PFA to assist with the administration of its responsibilities with respect to the Bonds."

The CDPFA issued $10 million in tax-exempt "bond anticipation notes" in 1996, and used the proceeds to acquire 140 acres of land in Palm Springs from the developer of what would become a surrounding 303-acre development known as Shadowrock. The 140 acres, plus 20 more to be acquired later, would then be developed (by Shadowrock) into an 18-hole championship golf course. The surrounding development was projected to include a casino, a resort hotel and townhouse complex, a spa and fitness center, and building lots for approximately 200 single-family homes.

The CDPFA also issued two series of tax-exempt revenue bonds in 1997. The series A bonds, for $15 million, were used to acquire the remaining 20

acres for the golf course; to pay off the earlier bond anticipation notes; and to purchase the golf course facilities (e.g., the clubhouse) built by Shadowrock. The series B bonds, for $50 million, were used to pay off the series A bonds; to buy land and improvements for the golf course; and to buy land and improvements for the Shadowrock development.

The Waterford PFA received $46,000 in administrative fees from the proceeds of the 1996 notes, and $75,000 (one-half of 1 percent of the face value) from the proceeds of the 1997 series A bonds. (The series B bonds were not included in the indictment.)

Angil Morris served as disclosure counsel for the 1996 CDPFA bond anticipation notes, for which it appears she was paid $27,500. She evidently paid Gnass $12,500 from this amount. Gnass was disclosure counsel for the CDPFA series A bonds, for which it seems he was paid $25,000.

Gnass's receipt of these payments in connection with the 1996 bond anticipation notes and the 1997 series A bonds formed the basis for counts 6 and 9 of the indictment, respectively.

The four other Marks-Roos PFA's, and their respective bond issues, were these:

The *California Commerce PFA* (CCPFA) was comprised of the Waterford PFA, the City of Mendota, and Georgetown Enterprises, a subsidiary of the Shoalwater Bay Indian Tribe. It is not clear from the record who served as its board of directors. The CCPFA issued $7.075 million in tax-exempt revenue bonds in 1996. The proceeds were to be used to acquire land and improvements in connection with a housing subdivision in southern Madera County known as the Bluffs at Riverbend. The Waterford PFA received $35,375 in administrative fees. And Morris, as disclosure counsel, was paid $12,500. This was the basis for count 4 of the indictment.

The *Malibu Canyon PFA* (MCPFA) was also comprised of the Waterford PFA, the City of Mendota, and Georgetown Enterprises. Georgetown's board of directors also served as the MCPFA's board. The MCPFA issued $6.150 million in tax-exempt bond anticipation notes in 1996. The proceeds were used to acquire land in connection with a private residential development in Malibu. The Waterford PFA received administrative fees of $30,750. Morris, as disclosure counsel, evidently was paid $15,000. This was the basis for count 5 of the indictment.

The *Lucerne Valley PFA* (LVPFA) consisted of the Waterford PFA and the Lucerne Valley Unified School District. Its three-person board included

one person (E. L. Davis) from the Waterford PFA. The LVPFA issued $4.430 million in tax-exempt revenue notes in 1996. The proceeds were used to build or acquire public improvements in connection with the Rancho Lucerne Golf Course Residential Community, a private development in San Bernardino County. The Waterford PFA received administrative fees of $44,300. Gnass, as disclosure counsel, was paid $25,000. This was the basis for count 7 of the indictment.

And the *Rancho Lucerne Valley PFA* (RLVPFA) was made up of the Waterford PFA and the City of San Joaquin. It too had a three-person board that included Davis from the Waterford PFA. The RLVPFA issued $3.375 million in tax-exempt revenue notes in 1996, and two series of tax-exempt revenue bonds in 1997 with a total face value of $10 million. The proceeds from the 1996 notes were used in connection with development of the Rancho Lucerne Golf Course Residential Community. The proceeds from the sale of the 1997 series A bonds ($9.550 million) were used in connection with the development of a municipal golf course and residential subdivision. And the proceeds from the series B bonds ($450,000) were used in connection with another private residential subdivision. The Waterford PFA received administrative fees of $60,000 from the 1996 notes, and $50,000 from the two 1997 bond issues. It appears that Gnass, as disclosure counsel, received $75,000 for his work on the 1996 notes, and $50,000 for his work on the 1997 bonds. His receipt of these payments formed the basis for counts 8 and 10 of the indictment.

The record indicates the Waterford PFA was also involved in other Marks-Roos PFA's, and in additional bond issues by the Marks-Roos PFA's mentioned above, but these other transactions did not figure into the offenses charged in the indictment.

To summarize, Gnass served as disclosure counsel for the Marks-Roos PFA, or provided support services to the disclosure counsel (Angil Morris), for each of the bond issues underlying the 10 counts in the indictment. He was paid in these roles a total of $185,000 directly, plus an additional $58,750 paid to his firm by Morris. The Waterford PFA, and ultimately the City of Waterford, received somewhere between $500,000 and $800,000 in "administrative fees" for their participation in the Marks-Roos PFA's.

Each of the 10 counts in the indictment alleged: "Count: [number] On or about [date], defendant WILLIAM ERNEST GNASS, did commit a FELONY, namely, a violation of Section 1090 of the Government Code, HAVING A FINANCIAL INTEREST IN A CONTRACT MADE IN AN OFFICIAL CAPACITY, in that the said defendant did willfully, unlawfully and feloniously make and

have a prohibited contract in an official capacity as a city attorney in which he had a financial interest. . . ." Gnass moved to set aside the indictment on three basic grounds. First, he argued there was insufficient evidence presented to the grand jury to show he had a financial interest in a contract made in his official capacity as city attorney of Waterford. (Pen. Code, § 995, subd. (a)(1)(B) [defendant indicted without reasonable or probable cause].) Second, he claimed the grand jury had not been properly instructed in regard to the application of section 1090 to a city attorney in particular, nor in regard to the "noninterest" exception in section 1091.5, subdivision (a)(9) (which provides that certain financial interests do not create a conflict if they have been disclosed). Third, he contended the failure of the district attorney to make or preserve a record of the entire grand jury proceedings (e.g., the district attorney's opening and closing statements) violated his rights to due process and equal protection. (*People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403 [92 Cal.Rptr.2d 829] (hereafter *Mouchaourab*).)

The court granted Gnass's motion on the first two grounds.

"The Court . . . is of the view that there was insufficient evidence presented to the grand jury to show or establish probable cause that these offenses were committed.

"The Court also finds here that jurors—not having been instructed in the language of Government Code Section 1091.5, in this Court's view, deprived the defendant of an opportunity here to present what could have been a valid defense through that instruction to the jury. That instruction clearly was not given. [¶] . . . [¶]

"But, again, utilizing the standard under [Penal Code section] 995 as to whether or not there was probable cause to believe the defendant committed these offenses, there was simply insufficient evidence to show there was any contract, where is the contract . . . [?]"

The court also expressed some concern about whether the grand jurors had been given sufficient time by the district attorney (about an hour) to review Gnass's *Johnson* materials (about 130 pages). The court expressly declined to base its ruling on the third ground asserted in Gnass's motion.

The People filed a timely appeal. (See Pen. Code, § 1238, subd. (a)(1); *People v. Keating* (1993) 21 Cal.App.4th 145, 148, fn. 2 [25 Cal.Rptr.2d 810] [the People may appeal from order setting aside an indictment].)

## DISCUSSION

Section 1090 provides in part that "[m]embers of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . ."[3] Under section 1097, "[e]very officer or person prohibited by the laws of this state from making or being interested in contracts . . . , who willfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

■ "The conflict-of-interest statutes are based upon '[t]he truism that a person cannot serve two masters simultaneously' [citation], which is regarded as a 'self-evident truth, as trite and impregnable as the law of gravitation . . . .' [Citation.]

"The duties of public office demand the absolute loyalty and undivided, uncompromised allegiance of the individual that holds the office. [Citations.] Yet it is recognized ' "that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government." ' [Citations.] Consequently, our conflict-of-interest statutes are concerned with what might have happened rather than merely what actually happened. [Citation.] They are aimed at eliminating temptation, avoiding the appearance of impropriety, and assuring the government of the officer's undivided and uncompromised allegiance. [Citation.] Their objective 'is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision . . . .' [Citations.]

"In view of the purposes of our conflict-of-interest statutes, it is well established that their scope is not limited to instances of actual fraud, dishonesty, unfairness or loss to the governmental entity, and criminal responsibility is assessed without regard to whether the contract in question

---

[3]The statute goes on to state: "As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

There appears to be no dispute that the Waterford PFA, and the Marks-Roos PFA's are "districts" within this definition, and that Gnass was an "officer or employee" for the purposes of section 1090. (See also *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 291 [295 P.2d 113] ["A person [e.g., a special city attorney] merely in an advisory position to a city is affected by the conflicts of interest rule"].) Nonetheless, as we will discuss below, the People now question whether Gnass was an officer or employee for purposes of section 1091.5, which excludes certain types of financial interests from the reach of section 1090.

is fair or oppressive. [Citation.] Thus, it has been repeatedly held that such matters are irrelevant under section 1090. [Citations.]" (*People v. Honig* (1996) 48 Cal.App.4th 289, 313-314 [55 Cal.Rptr.2d 555] (hereafter *Honig*).)[4]

▮ The People contend Gnass had a prohibited financial interest in the joint powers agreements that created the six Marks-Roos PFA's.[5] They argue, in effect, that Gnass used his position as the City Attorney of Waterford to convince the Waterford PFA to enter into the agreements, knowing or expecting the Marks-Roos PFA would then hire him, directly or through Morris, to act as disclosure counsel for each of the 10 bond issues underlying the indictment. The main issues then are whether, under this scenario, Gnass was acting in his capacity as the city attorney when he dealt with the Waterford PFA; whether his influence on the Waterford PFA was such that he can be said to have "made" the joint powers agreements, or caused them to be made; whether his hope or expectation of being hired as disclosure counsel by the Marks-Roos PFA was sufficient to make him "financially interested" in the agreements; and whether Gnass "knowingly" and "willfully" caused a contract to be made in which he had a financial interest. (*Honig, supra,* 48 Cal.App.4th at p. 322.)[6] Accordingly, we must decide whether, drawing all reasonable inferences in favor of the indictment,

<hr>

[4]Prior to reviewing the purpose, scope, and application of the conflict-of-interest statutes, the court in *Honig* issued the following caution: "many of the cited cases are civil rather than criminal. Moreover, some of these cases preceded the 1963 addition of the term 'financially' to section 1090 and the 1955 addition of the term 'willfully' to section 1097. Consequently these cases are not controlling on the scienter or mental state at issue here or on interests which are not financial in nature. Nevertheless, they are instructive on the construction and interpretation of other elements of these statutes." (*Honig, supra,* 48 Cal.App.4th at p. 313.) We too proceed with these limitations in mind.

[5]In their reply brief, the People assert, without any real analysis, that Gnass also had a conflict of interest with respect to his agreement with Morris to provide support services.

[6]The trial court in *Honig* gave the following general instruction defining a criminal conflict of interest: " 'Any state Officer [or employee] who, acting in his official capacity, who [*sic*] willfully makes or causes to be made a contract in which he has a financial interest is guilty of a violation of Government Code section 1090 and 1097. [¶] In order to prove such a crime, each of the following elements must be proved: [¶] (1) that the person is a state officer [or employee]; [¶] (2) that the person acted in his official capacity; [¶] (3) that the person knowingly; and [¶] (4) willfully made or caused to be made a contract in which he had a financial interest.' " (*Honig, supra,* 48 Cal.App.4th at p. 322.)

Honig did not challenge this instruction. He did, however, contest several of the court's specific instructions defining a "financial interest" and the requisite mental state for the offense (knowing and willful). With one exception found to be harmless, the appellate court upheld these instructions. (*Honig, supra,* 48 Cal.App.4th at pp. 321-341.)

As for what constitutes a financial interest, the court summarized its conclusions this way: "Put in ordinary, but nonetheless precise, terms, an official has a financial interest in a contract if he might profit from it." (*Honig, supra,* 48 Cal.App.4th at p. 333.) As for the required mental state, the court held the violation must be both knowing and willful. It said " 'willfully,' as applied in this context, means that the official must purposefully make a

the evidence presented to the grand jury on these questions was sufficient to support a "strong suspicion" Gnass had violated sections 1090 and 1097. (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1029 [13 Cal.Rptr.2d 551, 839 P.2d 1059] (hereafter *Cummiskey*); *People v. Pic'l* (1982) 31 Cal.3d 731, 737 [183 Cal.Rptr. 685, 646 P.2d 847].)

### 1. *Was Gnass Acting in His Official Capacity?*

The People acknowledge the Waterford PFA was a separate legal entity from the City of Waterford. (See § 6507 [JPA is a public entity separate from the parties to the agreement creating it]; *Rider v. City of San Diego, supra,* 18 Cal.4th at pp. 1043-1044.) They argue, however, that the Waterford PFA and the City, in practice if not in form, were "one and the same" such that we should "pierce the veil" between them for purposes of applying the conflict-of-interest statute. Indeed, the city council members also served ex officio as the board of the Waterford PFA; the two agencies often held their meetings one right after the other; Gnass was counsel for both of them (and for the Waterford redevelopment agency and planning commission as well); and the "administrative fees" paid to the Waterford PFA by the Marks-Roos PFA were passed on to the City to fund capital improvement projects. Further, it appears from the testimony of some former city council members, and the City's former finance director (Gary Whitfield), that they made no real distinction between the three agencies, or between Gnass's roles as counsel for each of them. Whitfield, for example, testified he believed Gnass was paid in all three roles under his agreement with the City to act as the city attorney.[7]

In reliance on *Rider v. City of San Diego, supra,* 18 Cal.4th 1035, Gnass disagrees with the People's contention. *Rider* involved a joint powers agreement between a multicity governmental agency (the port district) that owned the local convention center, and one of the member cities within the district (San Diego) that operated the convention center under a management agreement with the district. The city and the district formed a financing authority to issue lease revenue bonds whose proceeds would be used to pay for an expansion of the center (under the city's direction). Once the expansion was

---

contract in which he is financially interested." (*Id.* at p. 334.) And, "the official must know that there is a reasonable likelihood that the contract may result in a personal financial benefit to him." (*Id.* at p. 338.)

We will discuss these instructions, and the district attorney's failure to give them in this case, in greater detail below.

[7]Whitfield was appointed the treasurer of Waterford in January of 1996, and later became the finance director in July of that year. He evidently held both these positions at the same time, and resigned them both in October or November of 1997. Thus, Whitfield arrived after most, but not all, of the Marks-Roos PFA's had been formed.

completed, the authority would sublease the center to the city for an amount equal to the authority's debt service on the bonds. The district, in turn, would pay the city a certain amount every year to help it meet this obligation. (*Id.* at pp. 1039-1041.)

The plaintiffs brought a validation action (Code Civ. Proc., § 863) alleging the authority was a "hollow shell" created by the city merely to circumvent the constitutional requirement that local governments get voter approval before incurring certain types of indebtedness. (*Rider v. City of San Diego, supra,* 18 Cal.4th at p. 1042.) The Supreme Court rejected this argument. It held the voter approval requirement did not apply because, under the Joint Exercise of Powers Act (§ 6500 et seq.), a JPA has a "genuine separate existence" from the governmental agencies that form it, and so does not fall under the constitutional provision (which applies, for example, to cities and counties but makes no mention of JPA's). (*Rider, supra,* 18 Cal.4th at pp. 1042-1043, 1044; see *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743 [115 Cal.Rptr. 485] [flood control district with same board members as county, and performing traditional county functions, not subject to debt limitation absent showing county actually controlled its decisions].)

*Rider,* however, does not resolve the question before us. Different considerations govern application of the conflict-of-interest statutes than were used in *Rider* to apply the constitutional debt limitation.

■ "In enacting the conflict-of-interest provisions the Legislature was not concerned with the technical terms and rules applicable to the making of contracts, but instead sought to establish rules governing the conduct of governmental officials. [Citation.] Accordingly, those provisions cannot be given a narrow and technical interpretation that would limit their scope and defeat the legislative purpose. [Citations.]" (*Honig, supra,* 48 Cal.App.4th at p. 314.) "We must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. [Citation.]" (*People v. Watson* (1971) 15 Cal.App.3d 28, 37 [92 Cal.Rptr. 860].)

' *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533 [49 Cal.Rptr.2d 676] (hereafter *Campagna*), a decision by this court, arose from a situation more closely analogous to the present one. Campagna was the city attorney for the City of Sanger. His retainer agreement with the city expressly excluded coverage for any litigation-related services, which he agreed to bill separately. In 1980, the city asked Campagna to look into retaining an outside law firm to file a claim against several chemical companies. Campagna negotiated, and the city approved, a contingency fee agreement with

his own firm in association with another firm from San Francisco (the contingency fee agreement). This agreement explained how the contingency fee would be determined based on the amount of any recovery, but not how the two firms would split the fee. Campagna made a separate oral agreement with the San Francisco firm by which his firm was to receive 35 percent of the total fee (the referral fee agreement). The litigation was eventually settled some 12 years later. However, the city resisted paying Campagna his share of the fee and brought an action for declaratory relief on the ground the two fee agreements violated Government Code section 1090. (*Campagna*, at pp. 535-537.)

We held the contingency fee agreement (to the extent it was between the city and Campagna's firm) did not violate the statute because Campagna had not negotiated it in his official capacity. That is, he was negotiating *with* the city (on behalf of his firm) and not *for* the city (as its attorney). (*Campagna, supra*, 42 Cal.App.4th at pp. 539-540.) We also held, however, that Campagna *was* acting in his official capacity when he negotiated the contingency fee agreement between the city and the San Francisco firm and, by extension, when he negotiated the referral fee agreement with the firm.

"We can think of no circumstances under which the court could have found [Campagna] was acting other than in his capacity as city attorney for [the city] at the time he negotiated with [the San Francisco firm] to receive a portion of the fee. . . . [Campagna] would not have been discussing the matter with the [San Francisco] firm had he not been retained by [the city] . . . to find a litigation firm to handle the [city's] claims. Finding such a firm and negotiating with that firm to represent the city was unquestionably within the course and scope of his official business as city attorney. [¶] Respondent cannot 'change hats' in order to negotiate a referral fee." (*Campagna, supra*, 42 Cal.App.4th at pp. 541-542.)

Just as Campagna could not "change hats" from city attorney to private attorney in his negotiations with the San Francisco firm, Gnass could not switch from representing the interests of the Waterford PFA in relation to the Marks-Roos PFA's to representing his own private interest in becoming disclosure counsel for them.

Moreover, to carry the analogy a bit further, it appears Gnass did not "change hats," at least in the minds of the board members and city officials with whom he was dealing, when he moved in the space of a single evening from being the attorney for the City, to being the attorney for the redevelopment agency, to being the attorney for the Waterford PFA (all of which agencies consisted of the same five people). He certainly was acting in *some*

official capacity in each of these roles, such that he owed a duty of "absolute loyalty and undivided, uncompromised allegiance" to the agencies he was representing. (*Honig, supra,* 48 Cal.App.4th at p. 314.)

Finally, it is worth noting once again that all the "administrative fees" paid to the Waterford PFA by virtue of its participation in the Marks-Roos PFA's were eventually turned over to the City for capital improvement projects. This was the primary, if not the only, reason why the Waterford PFA agreed to participate in the bond issues in the first place. Thus, even in his role as the attorney for the Waterford PFA, Gnass was, or should have been, working for the ultimate benefit of the City.

We believe under these circumstances that the nice legalistic differences between the City of Waterford and the Waterford PFA are not determinative of the matter before us. We therefore hold the evidence was sufficient to establish probable cause to believe Gnass was acting in his official capacity when he advised the Waterford PFA with regard to the joint powers agreements.

### 2. Did Gnass "Make" the Joint Powers Agreements?

While conceding that Gnass did not, strictly speaking, "make" the joint powers agreements by which the Marks-Roos PFA's were formed, the People contend he caused them to be made by using his expertise and his position as the city attorney to "direct the Waterford City Council down a path which led to numerous lucrative bond transactions."

"Although section 1090 refers to a contract 'made' by the officer or employee, the word 'made' is not used in the statute in its narrower and technical contract sense but is used in the broad sense to encompass such embodiments in the making of a contract as preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications and solicitation for bids. [Citation.] Such construction is predicated upon the rationale that government officers and employees are expected to exercise absolute loyalty and undivided allegiance to the best interests of the governmental body or agency of which they are officers or employees, and upon the basis that the object of such a statute is to remove or limit the possibility of any personal influence, either directly or indirectly which may bear on an officer's or employee's decision. [Citation.]" (*Millbrae Assn. for Residential Survival v. City of Millbrae* (1968) 262 Cal.App.2d 222, 237 [69 Cal.Rptr. 251]; see also *Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569-571 [25 Cal.Rptr. 441, 375 P.2d 289].) Thus, "the test is whether the officer or employee *participated in* the making of the contract in his official capacity."

(*Millbrae Assn. for Residential Survival v. City of Millbrae, supra,* 262 Cal.App.2d at pp. 236-237, fn. omitted, italics added.)

For example, in *Stigall v. City of Taft, supra,* 58 Cal.2d 565, a member of the city council (Black) was also in charge of the city's building committee, which supervised the drawing of plans and specifications and call for bids for the construction of a civic center. Black was also the owner of a plumbing company that submitted the low bid for the plumbing work on the project. When objections were made to Black's possible conflict of interest, the city rejected all bids and reopened the bidding process. Black's company was again the low bidder. This time, Black resigned from the city council just before it awarded the construction contract to the company that was using Black's bid. The issue then was whether Black could be said to have "made" the contract within the meaning of section 1090.

The Supreme Court acknowledged that a contract had not been made, in a legal sense, until the city council accepted the construction company's offer, which in this case did not occur until after Black's resignation. But the court then went on to say that "if we were to hold that the purpose sought to be accomplished by the enactment of the statutory [conflict-of-interest] provisions could, by such strict construction, be so easily frustrated, we would necessarily close our eyes to the clear legislative intent." (*Stigall v. City of Taft, supra,* 58 Cal.2d at p. 569.) It therefore concluded: "the negotiations, discussions, reasoning, planning and give and take which goes beforehand in the making of the decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense. The instant statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the city." (*Ibid.*) It is these preliminary discussions and negotiations, the court pointed out, that give the resulting contract "its substance and meaning." (*Id.* at p. 570; see also *People v. Vallerga* (1977) 67 Cal.App.3d 847, 868-869 [136 Cal.Rptr. 429] [defendant, who did not participate in preliminary discussions and negotiations to sell a computer program, was nonetheless held to have "made" the contract in that he conducted a test run that helped convince the prospective buyer to go ahead with the deal] [discussed more fully, *infra*].)

In *Thomson v. Call* (1985) 38 Cal.3d 633 [214 Cal.Rptr. 139, 699 P.2d 316], the owner (IGC) of a 36-acre parcel of land in the City of Albany proposed to build a large high-rise residential development on the land. There followed a lengthy period of discussions and negotiations between IGC, the city, and several other parties. It culminated in an agreement by which the city, as a condition for granting IGC a use permit, required IGC to

acquire some small parcels of land adjacent to its 36 acres for use as a public park. One of these parcels belonged to Call, an Albany city councilman. As part of a complex sequence of transactions in escrow to carry out the agreement, IGC bought Call's property for what was arguably a generous price, and then conveyed it to the city. (*Id.* at pp. 638-643.)

A group of taxpayers brought an action to invalidate the deal on the ground Call's involvement created a conflict of interest in violation of section 1090. The trial court agreed. It ordered Call to forfeit to the city the money he was paid for the property, but permitted the city to retain title to it. Call appealed from the forfeiture order. (*Thomson v. Call, supra,* 38 Cal.3d at p. 638.) He maintained the purchase of his land by IGC was not a condition of the contract between IGC and the city. The Supreme Court disagreed. It held that, however complex the whole arrangement, it was all part of a single multiparty agreement. (*Id.* at p. 644.) The court found, in other words, that Call, in his capacity as a city councilman, had participated in the making of the contract that created the conflict of interest. "[T]he prospect that performance of the contract would involve acquisition of the Calls' land and conveyance of that land to the city was contemplated by all parties." (*Ibid.*) The court also noted in any event that "the policy goals of section 1090 support the rule that public officers 'are denied the right to make contracts in their official capacity with themselves *or to become interested in contracts thus made.*' [Citation.]" (*Id.* at p. 645.)

Similarly, in *Honig, supra,* 48 Cal.App.4th 289, the court looked past the individual contracts in question and considered the relationships between all the parties connected with them, either directly or indirectly, to determine if a conflict of interest existed. Honig was the State Superintendent of Public Instruction. His wife was the founder and director of a nonprofit corporation known as the Quality Education Project (QEP). Over a period of several years, Honig, without following the procedures usually applicable in such situations, directed his staff to arrange for a series of contracts or "grants" to be made by the Department of Education (DOE) to certain school districts. The money was used to pay the salaries of persons who actually worked for neither the districts nor the ·DOE, but for QEP. On this basis, Honig was charged and found guilty of four counts of violating sections 1090 and 1097. (*Honig,* at pp. 304-312.)

The appellate court affirmed the conviction, finding that Honig, although he had made no contracts with his wife's corporation in the legal sense, had caused them to be made. The court explained: "In considering conflicts of interest we cannot focus upon an isolated 'contract' and ignore the transaction as a whole. [Citation.] It appears clear that the payment of DOE funds to

the school districts, the districts' payment of those funds to QEP employees in the form of continued salaries and benefits, and the employees' work for QEP, were in performance of single multiparty agreements. [Citation.] In short, defendant simply used the school district contractors as conduits to funnel DOE funds to individuals as compensation for working for his wife's corporate employer. The use of a third party as a contractual conduit does not avoid the inherent conflict of interest in such a transaction. [Citation.]" (*Honig, supra,* 48 Cal.App.4th at p. 320, citing to *Thomson v. Call, supra,* 38 Cal.3d 633; see also *People v. Watson, supra,* 15 Cal.App.3d 28 [harbor commissioner voted to lease harbor facilities to company to which he had loaned money].)

On the strength of these cases, the People argue Gnass used the entire Marks-Roos bond process to "set up the opportunity to be appointed as disclosure counsel." They assert:

"Viewing the circumstances in their entirety, the grand jury reasonably could have inferred that [Gnass] directed enough of the complex transactions that his conduct constituted the 'preliminary discussions, negotiations, compromises, and reasoning' which equate to a contract being 'made' within the meaning of section 1090. First, there was some evidence that [Gnass] introduced the bond idea to the city council. . . . Second, several of the former city council members directly or indirectly expressed their lack of knowledge about Marks-Roos bonds. . . . [¶] Third, the city council and the Waterford PFA members were one and the same. . . .

"Fourth, following [Gnass's] lead, and in light of the City's financial problems, the council formed the Waterford Public Financ[ing] Authority for the specific purpose of joining other entities in joint power[s] agreements. In 1996 and 1997, the Waterford PFA entered into the [Marks-Roos] PFAs in issue. The evidence circumstantially showed that [Gnass] explained the necessity and benefits of entering such agreements. Once the Waterford PFA voted to enter the agreements, someone had to find other entities who were willing to form joint power[s] [agencies] to issue bonds. Thereafter, the joint power[s] agreements had to be negotiated, and those negotiations would have included the nature of the projects to be funded, the principle [*sic*] amount of the bonds, whether more than one series would be required, and most importantly to the Waterford PFA, the amount of its administrative fee.

"The circumstantial evidence established that [Gnass] negotiated these contracts on the Waterford PFA's behalf. . . . The evidence established that the Waterford PFA considered and relied upon [Gnass] in all respects regarding the bond process. As such, the creation of the Waterford PFA was

only a means to an end and was likely only an attempt on [Gnass's] part to avoid a conflict-of-interest claim. . . .

"Once the joint power[s] agreements were in place, joint PFAs were formed and disclosure counsel could be appointed. It is not surprising that [Gnass] was appointed as disclosure counsel early on and thereafter arranged to have Morris appointed when [Gnass] began to experience outside pressure. . . . The grand jury could reasonably have inferred that [Gnass] was guaranteed to be appointed as disclosure counsel by each [Marks-Roos] PFA of which the Waterford PFA was a member.

"The conflict of interest which [Gnass] created is clearly seen. The more joint power[s] agreements the Waterford PFA entered into, the more times [Gnass] would be appointed disclosure counsel. His duty to advise the Waterford City Council and the Waterford PFA about the prudence and legality of the bonds was compromised by the financial benefit he derived from each bond series." (Fn. omitted.)

However, we find scant support in the record for several of these assertions. In fact, the evidence directly controverts the People's initial claim that the City, on Gnass's advice, formed the Waterford PFA "for the specific purpose of joining other entities in joint power[s] agreements." The City formed the Waterford PFA in 1990, and issued some bonds of its own, some five years before it joined the first Marks-Roos PFA. And, in the interim, most if not all of the original council members and city officials had been replaced by others. So there likewise is no support for the People's related assertion that "the creation of the Waterford PFA was only a means to an end and was likely only an attempt on [Gnass's] part to avoid a conflict-of-interest claim."

Similarly, we find no substantial support for the People's contention that Gnass "negotiated" the joint powers agreements on behalf of the Waterford PFA, or that these negotiations involved finding other public agencies with which to form Marks-Roos PFA's, and also included defining "the nature of the projects to be funded, the principle [sic] amount of the bonds, whether more than one series would be required, and . . . the amount of its administrative fee." It is reasonable to suppose that Gnass represented the Waterford PFA in this process, and reviewed the various Marks-Roos proposals on the Authority's behalf, but there is no evidence Gnass's role went beyond that to the point where he was the person actually putting these complex funding packages together. The implication of the People's contention is that Gnass not only controlled the Waterford PFA but also enough of the rest of the process that he was "guaranteed to be appointed as disclosure counsel." This is simply speculation.

Finally, the evidence effectively refutes the People's argument that "[i]t is not surprising that [Gnass] was appointed as disclosure counsel early on and thereafter arranged to have Morris appointed when [Gnass] began to experience outside pressure." It is not true that Gnass was disclosure counsel only for the initial bond issues and was then replaced by Morris. The record shows just the opposite. Morris was disclosure counsel for five of the first six bond issues (i.e., those underlying counts 1, 2, 4, 5, and 6), while Gnass was disclosure counsel for the last four bond issues (i.e., those underlying counts 7, 8, 9, and 10). It follows that the People's implication that Gnass was trying to conceal his role in the bond issues by working through Morris is unfounded.[8] Similarly, there is no evidence Gnass "arranged" to have Morris appointed as disclosure counsel. Morris testified she could not recall who approached her about the position, but she did not think it was Gnass. She testified further that she was invited to the formation meeting of the Marks-Roos PFA by the PFA's bond counsel (who was not Gnass), and was interviewed by the board before she was hired.

■ "The interest proscribed by Government Code section 1090 is an interest in the contract. The purpose of the prohibition is to prevent a situation where a public official would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence." (*People v. Vallerga, supra,* 67 Cal.App.3d at pp. 867-868, fn. 5.) "[A]n official (or a public employee) may be convicted of a violation [of sections 1090 and 1097] no matter whether he actually participated personally in the execution of the questioned contract, if it is established that he had the opportunity to, and did, influence execution directly or indirectly to promote his personal interests." (*People v. Sobel* (1974) 40 Cal.App.3d 1046, 1052 [115 Cal.Rptr. 532].)

---

[8]The People go so far as to assert that Gnass's professional relationship with Morris was proof he had a conflict of interest. "[I]t is of great significance that respondent used Morris to continue receiving disclosure counsel fees after he felt pressure from the attorney general's office and the district attorney. Substituting Morris as disclosure counsel and yet splitting her fee goes all the way in demonstrating that [Gnass] knew he had a conflict of interest. Morris was just another veil [Gnass] used to avoid the appearance of self-dealing."

The district attorney sought to create this same impression with the grand jury, i.e., that Morris's role was somehow meant to conceal Gnass's involvement in the bond issues. For example, the district attorney asked several questions of some former city council members that supposed it was the Waterford PFA rather than the Marks-Roos PFA's that had issued the bonds. On this premise, he then asked whether they had been aware Morris was the disclosure counsel for some of the bond issues, or whether they had participated in the decision to hire her. They had not. But, of course, there was no reason why they should have been involved in that decision, so the questions did little more than raise a suggestion of wrongdoing.

This tactic appears to have worked. Three of the five questions the grand jurors asked of the witnesses concerned their knowledge, or lack of knowledge, about Morris's role as disclosure counsel.

 We believe the evidence, stripped of the People's rather over-wrought analysis, reasonably supports the conclusion that Gnass was in a position to exert considerable influence over the decisions by the Waterford PFA to join the six Marks-Roos PFA's, and probably did. Of course, this would have been consistent with his role as the Waterford PFA's attorney, and does not necessarily import an improper motive on his part. The next question then is whether he exerted this influence with an expectation of financial gain.

### 3. Was Gnass "Financially Interested" in the Joint Powers Agreements?

As we have explained, the People argue the evidence was sufficient to show that Gnass had enough control over the Marks-Roos bond process that he was "guaranteed to be appointed as disclosure counsel by each [Marks-Roos] PFA of which the Waterford PFA was a member." While we disagree the evidence establishes quite so much, the certainty of financial gain is not necessary to create a conflict of interest. "[T]he object of the [statute] is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision . . . ." (*Stigall v. City of Taft, supra,* 58 Cal.2d at p. 569.) "The government's right to the absolute, undivided allegiance of a public officer is diminished as effectively where the officer acts with a hope of personal financial gain as where he acts with certainty." (*Honig, supra,* 48 Cal.App.4th at p. 325.)

 "[T]he term 'financially interested' in section 1090 cannot be interpreted in a restricted and technical manner. The law does not require that a public officer acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, nor does it require that the officer share directly in the profits to be realized from a contract in order to have a prohibited interest in it. [Citations.] Rather, '[t]he instant statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the [state].' [Citation.] The fact that the officer's interest 'might be small or indirect is immaterial so long as it is such as deprives the [state] of his overriding fidelity to it and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good.' [Citation.] . . .

"Moreover, prohibited financial interests are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied

agreement and may be inferred from the circumstances. [Citations.]" (*Honig, supra,* 48 Cal.App.4th at p. 315.)[9]

In addition, as we noted above, "the policy goals of section 1090 support the rule that public officers 'are denied the right to make contracts in their official capacity with themselves *or to become interested in contracts thus made.'* [Citation.]" (*Thomson v. Call, supra,* 38 Cal.3d at p. 645 [city council member arguably arranged to sell property to developer *after* developer agreed to buy and convey property to city for a park].)

This rule also had some application in *People v. Vallerga, supra,* 67 Cal.App.3d 847. The defendant Vallerga was the tax assessor for Orange County. During the term of his predecessor (Hinshaw), the assessor's office had developed a computerized property appraisal program, which it offered to other counties for the cost of reproducing it (about $2,000). The assessor for Spartanburg County, South Carolina (Ebert) was interested in the program, and contacted Hinshaw. Hinshaw and Ebert worked out a sale-purchase agreement, which was contingent on a successful test run of the program using data from Spartanburg County. Ebert promised to pay Hinshaw a $6,000 consulting fee if the deal was completed. Vallerga, who was aware of these negotiations, ran the test in the Orange County assessor's office. The test was successful, the deal was closed, and Hinshaw was paid his fee. He then paid half of it to Vallerga. Vallerga was subsequently charged and convicted of, among other crimes, a violation of sections 1090 and 1097. (*Vallerga,* at pp. 856-864.)

Vallerga argued on appeal both that he had not "made" the purchase-sale contract (because it had been worked out by Hinshaw and Ebert on behalf of their two counties), and that he had no financial interest in the contract (because, he claimed, he did not know Hinshaw was going to share the consulting fee with him). The court rejected both claims. We briefly

[9]The following instruction was approved by the court in *People v. Watson, supra,* 15 Cal.App.3d 28: " 'The word "financially interested" as used in Government Code section 1090 means any financial interest which might interfere with a city officer's unqualified devotion to his public duty. The interest may be direct or indirect and includes any monetary or proprietary benefits, or gain of any sort, or the contingent possibility of monetary or proprietary benefits. The interest is direct when the city officer, in his official capacity, does business with himself in his private capacity. The interest is indirect when the city officer, or the board of which he is a member, enters into a contract in his or its official capacity with an individual or business firm, which individual or business firm, by reason of the city officer's relationship to the individual or business firm at the time the contract is entered into, is in a position to render actual or potential pecuniary benefits directly or indirectly to the city officer based on the contract the individual business firm has received.' " (*Watson, supra,* at p. 37; see also *People v. Vallerga, supra,* 67 Cal.App.3d at p. 867; *People v. Darby* (1952) 114 Cal.App.2d 412, 433, fn. 4 [250 P.2d 743] [Instruction A].)

discussed the first one above. As for the second one, the court concluded the evidence could be interpreted reasonably to support the inference Vallerga expected to be paid because he had gone to some considerable effort to conduct the test runs. (*People v. Vallerga, supra,* 67 Cal.App.3d at pp. 866-867.)

 Here, as we have explained, there was no evidence concerning Gnass's role, if any, in the process by which the other public agencies were selected to join the Waterford PFA in forming the Marks-Roos PFA's; how and by whom the Marks-Roos PFA's were put in touch with private developers in need of bond financing; how and by whom it was decided who would serve on the boards of the Marks-Roos PFA's; and how these boards selected the persons it chose to serve as disclosure counsel for the bond issues. We also note that the board members of the Waterford PFA did not form a majority of the boards of any of the Marks-Roos PFA's, and the Waterford PFA was not represented at all on several of them. So it is not possible to say with any certainty that Gnass expected to be appointed disclosure counsel based on his connections with whomever was making those decisions.

On the other hand, Gnass was the disclosure counsel, or his firm was paid by the disclosure counsel, for all 11 of the bond series issued by the six Marks-Roos PFA's. He thus *became* interested in the joint powers agreements inasmuch as it was arguably foreseeable, once he had been selected to serve as disclosure counsel in some capacity, that he would continue to be offered the position.

The present situation is similar in many respects to the one in *U.S. v. Mississippi Valley Co.* (1961) 364 U.S. 520 [81 S.Ct. 294, 5 L.Ed.2d 268], a decision upon which our state courts have often relied. The Mississippi Valley Generating Company (MVG) sued the federal government in an effort to recover money it had spent in performance of a contract with the government to build a power plant. The government defended its cancellation of the contract on the ground, among others, that it was unenforceable because the person who negotiated it on behalf of the government, a Mr. Wenzell, had a conflict of interest under a federal statute comparable to section 1090. Wenzell was an executive and director of the First Boston Corporation, a large financial institution with considerable experience in the financing of private power plants. He participated in the negotiations, at the government's request, as an unpaid advisor while continuing to draw his salary from First Boston. (The federal conflict-of-interest statute applies to agents as well as to employees of the government.) First Boston subsequently provided some of the financing for MVG. The question then was

whether Wenzell was financially interested, directly or indirectly, in the contract.

The Supreme Court first rejected an argument, like the one made in *Thomson v. Call, supra,* 38 Cal.3d 633 and *Honig, supra,* 48 Cal.App.4th 289 (see *ante*), that the statute did not apply to Wenzell because he had engaged only in preliminary negotiations, or, in the language of section 1090, that he had not "made" the contract. The court said, however, that the negotiations were part of a "continuous course of dealings" and formed "the very foundation upon which the final contract was based." (*U.S. v. Mississippi Valley Co., supra,* 364 U.S. at pp. 553-554 [81 S.Ct. at p. 311].)

More importantly for purposes of the present discussion, the court found Wenzell had a financial interest in the contract because "the logic of circumstances" placed him in the sort of "ambivalent position" proscribed by the statute.

"[B]ecause the sponsors [the private individuals who would later form MVG] were in a position to affect the fortunes of himself and his firm, [Wenzell] was, to say the least, subconsciously tempted to ingratiate himself with the sponsors and to accede to their demands, even though such concessions might have been adverse to the best interests of the Government. By thus placing himself in this ambiguous situation, Wenzell failed to honor the objective standard of conduct which the statutes prescribes." (*U.S. v. Mississippi Valley Co., supra,* 364 U.S. at p. 557 [81 S.Ct. at p. 313].)

We believe the same might reasonably be said about the circumstances in which Gnass found himself when he was advising the Waterford PFA about whether to join the joint powers agreements, or when he was negotiating on behalf of the Waterford PFA with the other public agencies that would make up the Marks-Roos PFA. Even if there were no agreement or understanding Gnass would be disclosure counsel, or could be if he wanted the job, he might have been tempted to foster that possibility by ingratiating himself with whomever would be making the decision. Thus, Gnass can be said to have had a financial interest in the joint powers agreements.

This brings us then to the question whether Gnass's interest in being appointed disclosure counsel for the Marks-Roos PFA's became a "noninterest," pursuant to section 1091.5, by virtue of his having disclosed it to the Waterford PFA.

*Section 1091.5*

As pertains to this case, section 1091.5 stated as follows at the time of the alleged offenses:

"(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶]

"(9) That of compensation for employment with a governmental agency, other than the governmental agency that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record."

As we have noted, the trial court set aside the indictment against Gnass both for lack of a showing he was financially interested in a particular contract, and also because the district attorney's failure to instruct the grand jury pursuant to subdivision (a)(9) of section 1091.5 "deprived [Gnass] of an opportunity here to present what could have been a valid defense . . . ."

The People maintain section 1091.5, subdivision (a)(9) does not apply to Gnass because he was not an "employee" of the Marks-Roos PFA's, but rather an independent contractor.[10]

We are at somewhat of a loss to figure out what section 1091.5, subdivision (a)(9) means from its language alone.

■ "The primary rule of statutory construction, to which all other such rules are subject, is that courts must ascertain the intent of the legislature. A statute must be construed in light of the legislature's purpose and design, and in enforcing its command, both the policy expressed in its terms and the object implicit in its history and background should be recognized. [Citation.] The mere literal construction of a provision ought not to prevail if it is opposed to the intention of the legislature as made apparent by the statute, provided that the words are sufficiently flexible to admit of some other construction which effectuates that intention. [Citation.]" (*In re Eldorado Ins. Co.* (1987) 189 Cal.App.3d 1149, 1152 [234 Cal.Rptr. 734].)

"The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole." (*Silver v. Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].)

■ The trial court evidently understood section 1091.5, subdivision (a)(9) to say that Gnass, in his dual roles as the attorney for the Waterford

---

[10]Of course, if Gnass was not an "employee" for purposes of section 1091.5, neither was he for purposes of section 1090, in which case the conflict-of-interest statutes would not apply at all. We see no reason why one could be an employee for one and not the other. But, for reasons that will shortly appear, we need not decide this question.

PFA and disclosure counsel for the Marks-Roos PFA's, did not have a prohibited conflict of interest so long as he disclosed to the Waterford PFA that he was also working as or for the disclosure counsel. (There was some evidence presented to the grand jury that Gnass made such disclosures.)

We disagree with this interpretation as a matter of both logic and statutory construction. Gnass's conflict of interest, if any, existed *before* the Marks-Roos PFA's were created, on the chance that, if they were, he might be hired as disclosure counsel. It would make little sense to require disclosure to the affected party (the Waterford PFA) *after* any damage from nondisclosure had been done (i.e., after the Waterford PFA had joined the Marks-Roos PFA's).

Moreover, we believe the court's interpretation of section 1091.5, subdivision (a)(9) focuses on the wrong contract. The employment contract is what creates the financial interest, not the conflict. That is, the subdivision is more comprehensible, and better serves the goal of the overall statutory scheme, if it is understood to apply to contracts under consideration *between two public agencies*, one of which employs the interested person. Where, for example, the person is an *employee* of public agency A and a *board member* of public agency B (or is otherwise in a position to influence agency B's decision), a conflict of interest might arise if agency B were considering making a contract with agency A.

We find support for this interpretation in an opinion by the Attorney General that concerned just this sort of situation. A deputy sheriff for a county was elected to the city council of a city within the same county. The question then was whether the city could contract with the sheriff's department to provide law enforcement services, and whether the deputy could be assigned such duties within the city. In answering these questions, the Attorney General considered, among other things, the application of section 1091.5, subdivision (a)(9).

"Here the legislative history of the 1991 amendment of section 1091.5 (Stats. 1991, ch. 382, § 1), which added subdivision (a)(9), is helpful in construing the amendment's language. In the report of the Assembly Committee on Elections, Reapportionment and Constitutional Amendments dated May 9, 1991, the background information supplied for the proposed legislation was as follows:

" 'According to the author, government employees who also serve as local elected officials are often prohibited from voting on a broad range of issues,

rather than just those bills that affect their employers. For example, a peace officer who is also an elected official may be prohibited from voting on contracts dealing with any city agency, rather than only those contracts affecting the police department.' [¶] . . . [¶]

"Consequently, subdivision (a)(9) of section 1091.5 may be construed as allowing a government employee who serves on the board of another public agency to vote on a contract between the agency and his government employer except when the contract involves his particular employing unit. Under this interpretation, the prospective councilman here could not participate in the decision to contract for law enforcement services, since the contract would specifically affect his own employing unit." (78 Ops.Cal.Atty.Gen. 362, 369-370 (1995).)

We find additional support in a second opinion of the Attorney General addressing these same questions in view of the subsequent amendment of section 1091.5, subdivision (a)(9).[11] The opinion explains: "[S]ubdivision (a)(9) of section 1091.5 deals specifically with contracts between two public agencies: [¶] . . . [quoting the statute] [¶] Hence, under the terms of subdivision (a)(9) of section 1091.5, a government employee who serves on the board of another public agency is deemed not to be financially interested in a contract between the agency and his employer [if he discloses the fact of his employment to the board] unless the contract directly involves the particular department in which he is employed." (83 Ops.Cal.Atty.Gen. 246, 248 (2000).)

 Although we are not bound by the Attorney General's opinions, they are entitled to "considerable weight." (*Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 662 [99 Cal.Rptr.2d 897].) This is particularly true where, as here, the Attorney General regularly advises local agencies about conflicts of interest, and where, as here, no clear case authority exists on the question before us. (*Id.* at pp. 662-663.)

 We find the opinions persuasive and conclude that, since the conflicts in question did not arise in connection with a contract or proposed

---

[11]Section 1091.5, subdivision (a)(9) was amended in 1999 to read as follows: "(a) An officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: [¶] . . . [¶] (9) That of a person receiving salary, per diem, or reimbursement for expenses from a government entity, unless the contract directly involves the department of the government entity that employs the officer or employee, provided that the interest is disclosed to the body or board at the time of consideration of the contract, and provided further that the interest is noted in its official record." (Stats. 1999, ch. 349, § 2.)

contract between the Waterford PFA and a Marks-Roos PFA, section 1091.5, subdivision (a)(9) does not apply here. It follows the district attorney was not required to give an instruction based on it.

### 4. Did Gnass Act "Knowingly" and "Willfully"?

 This is a question the parties have addressed only very obliquely.[12] A violation of section 1090 is subject to both civil and criminal remedies. Under section 1092, "[e]very contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein." (See *Terry v. Bender* (1956) 143 Cal.App.2d 198, 207 [300 P.2d 119].)[13] Under section 1097, a person who "willfully" violates section 1090 " 'is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison . . . .' " (*Honig, supra,* 48 Cal.App.4th at p. 313.) Consequently, to impose criminal liability for a violation of section 1090, it must be proved a public official or employee, acting in his or her official capacity, " '*knowingly* . . . and [¶] . . . *willfully* made or caused to be made a contract in which he [or she] had a financial interest.' " (*Honig,* at pp. 322, 333-334 (italics added).)

 " '[W]illfully,' as applied in this context, means that the official must purposefully make a contract in which he is financially interested." (*Honig, supra,* 48 Cal.App.4th at p. 334.) "Knowingly" means "the official must know that there is a reasonable likelihood that the contract may result in a personal financial benefit to him [or her]." (*Id.* at p. 338.)

 Here, the district attorney read only the following four instructions to the grand jury:

"The Grand Jury shall find an indictment when all of the evidence taken together, if unexplained or uncontradicted, would in its judgment warrant a

---

[12]In his respondent's brief, Gnass simply asserts he was never properly charged with a criminal violation of section 1090 under section 1097. The People counter that the issue was waived but, in any event, that Gnass was given adequate notice of the charges against him because section 1097 only prescribes the punishment for a violation of section 1090.

We therefore have asked the parties to submit supplemental briefing with regard to this question, and in particular with regard to the district attorney's failure to instruct on this and other elements of a criminal conflict of interest.

[13]Gnass makes the following argument in support of his position section 1090 does not apply to him at all. He claims section 1092 necessarily voids every contract made in violation of section 1090, and requires the interested party (himself in this case) to return any money received under the contract. Therefore, he concludes, since he received no money from the Waterford PFA in his position as disclosure counsel, there is nothing to repay them. Ergo, without a remedy there can be no violation. This appears actually to be a variation of his contention he was not acting in his official capacity when he served as disclosure counsel. We find it unpersuasive.

conviction by a jury trial. This means that the Grand Jury must find probable cause before an indictment is found.

"Probable cause means that each Grand Juror voting to find an indictment is convinced of a state of facts that would lead a person of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion that a public offense has been committed and a strong suspicion of the guilt of the accused.

"The next instruction: Members of the legislature, state, county, district, judicial district and city officers or employees shall not be financially interested in any contract made by them in their official capacity or by any board—I'm sorry. Strike that—or by any body or board of which they are members nor shall state, county, district, judicial district and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity. That's Penal [*sic*] Code Section 1090.

"The next instruction: 'District' means any agency of the state founded pursuant to general law or special act for the local performance of government or proprietary functions within limited boundaries, the definition of district in Penal [*sic*] Code Section 1090.

"The final and fourth instruction: The purpose of conflict of interest statutes is well established in that their scope is not limited to instances of actual fraud, dishonesty, unfairness or loss to the government entity, and criminal responsibility is assessed without regard to whether the contract in question is fair or oppressive. Thus, it has been repeatedly held that such matters are irrelevant under Government Code Section 1090."

Plainly, the district attorney did *not* instruct the grand jury on the "knowing" and "willful" elements that elevate a violation of section 1090 to a crime. (§ 1097; *Honig, supra,* 48 Cal.App.4th at pp. 322, 333-334.) For reasons we will explain, we believe the instructions that *were* given were not simply incomplete, as the People contend, but were in fact misleading. Further, the confusion was compounded by other circumstances that appear to have hindered the grand jury's deliberations. Therefore, we will conclude it is possible, if not likely, the grand jury indicted Gnass on something less than reasonable or probable cause.

 We begin by acknowledging the general proposition that the prosecution has no duty to instruct a grand jury on the law in the same manner a trial judge must instruct a petit jury. (*Cummiskey, supra,* 3 Cal.4th at p. 1034.) However, a claim of instructional error is a cognizable basis for a

motion to set aside an indictment under Penal Code section 995, subdivision (a)(1)(B), in that it is "manifestly tantamount" to a claim the grand jury, as instructed, may have indicted the defendant on less than reasonable or probable cause. (*Cummiskey*, *supra*, 3 Cal.4th at p. 1022, fn. 1.) So too is a claim that "the manner in which the prosecutor conducted the grand jury proceedings ran afoul of [the defendant's] due process rights under the relevant statutory and common law principles governing indictment by grand juries." (*Ibid.*)

"In sum, California law provides that a defendant has a due process right not to be indicted in the absence of a determination of probable cause by a grand jury acting independently and impartially in its protective role. [Citations.] An indicted defendant is entitled to enforce this right through means of a challenge under section 995 to the probable cause determination underlying the indictment, based on the nature and extent of the evidence and the manner in which the proceedings were conducted by the district attorney. [Citations.]" (*Mouchaourab*, *supra*, 78 Cal.App.4th at pp. 424-425.)

The court in *Mouchaourab* thus summarized the law after reviewing *Cummiskey* and two other, earlier decisions by our Supreme Court that have discussed the role of the district attorney in relation to criminal grand juries: *People v. Backus* (1979) 23 Cal.3d 360 [152 Cal.Rptr. 710, 590 P.2d 837] and *Johnson v. Superior Court*, *supra*, 15 Cal.3d 248. The issue in *Mouchaourab* was the extent to which an indicted defendant may obtain discovery of nontestimonial portions of a grand jury proceeding for the purpose of preparing a Penal Code section 995 motion.

"Our Supreme Court has recognized that the grand jury's ability to consider the evidence impartially and independently in order to determine whether there is probable cause to indict may be prejudiced by the manner in which the prosecutor conducts the grand jury proceedings, including advice, instructions and argument." (*Mouchaourab*, *supra*, 78 Cal.App.4th at p. 407.) On this basis, the court held a defendant is entitled to the transcripts of communications between the prosecutor and the grand jury that could have had some bearing on the jury's determination of probable cause, which in *Mouchaourab* included the prosecutor's opening and closing remarks and argument, and responses to the jury's requests for read-backs of witness testimony.[14] (*Mouchaourab*, at pp. 407-408, 436-437.)

The court reached this result notwithstanding Penal Code sections 938 and 938.1, which provide only that *testimonial* evidence need be transcribed.

_____

[14]In the cases before the court in *Mouchaourab*, these communications, although they had not been turned over to the defendants, had in fact been transcribed. Moreover, the defendants had been given transcripts of the other communications they requested, including

(*Mouchaourab, supra*, 78 Cal.App.4th at pp. 417, 428.) In this respect, the court was following the lead of the Supreme Court in *Cummiskey* and its predecessors, insofar as these decisions had broadly interpreted other statutes affecting a defendant's right to challenge the conduct of a grand jury proceeding. In addition, the court noted: "In *Backus* and *Cummiskey* it is apparent that the court reviewing the indicted defendant's motion to dismiss had before it a record of nontestimonial as well as testimonial portions of the grand jury proceedings . . . . These nontestimonial portions of the record were disclosed and were reviewed by the court without comment. We can only conclude that the disclosure of the nontestimonial portion of the records in *Backus* and *Cummiskey* was implicitly approved by the Supreme Court. Were we to find that respondent court in the cases before us abused its discretion by ordering disclosure of the same and similar nontestimonial portions of the record as were allowed in *Backus* and *Cummiskey*, such a holding would be out of step with policy and procedure implicitly approved by our high court." (78 Cal.App.4th at p. 435.)

As in *Mouchaourab*, we believe *Johnson, Backus*, and *Cummiskey* are instructive on the questions before us.

In *Johnson v. Superior Court, supra*, 15 Cal.3d 248, the magistrate dismissed a criminal complaint against the defendant upon finding his testimony at the preliminary hearing had effectively explained away the charges. The district attorney, without disclosing the defendant's exculpatory testimony, then secured an indictment from the grand jury for the same offense. The defendant sought to restrain the court from proceeding with the trial, arguing the district attorney had an implied duty under Penal Code section 939.7 to disclose the testimony. That section provides: "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses."

The People argued in response that the district attorney is not obligated to present exculpatory evidence to the grand jury unless the jury calls for it.

the witness's testimony, the prosecutor's presentation of exculpatory evidence (the *Johnson* materials), the prosecutor's admonishments regarding evidence admissible for a limited purpose. (*Mouchaourab, supra*, 78 Cal.App.4th at p. 408.) Therefore, the court found no need to decide whether any particular portion of a grand jury proceeding, other than the witnesses' testimony, *must* be recorded. (*Id.* at p. 437.)

In the present case, the transcript includes the witnesses' testimony; the *Johnson* materials; the jurors' questions to the witnesses and the prosecutor, and their answers; and the jury instructions read to the grand jury by the prosecutor. It does not include the prosecutor's opening and closing remarks and argument, which were *not* transcribed. Gnass argues the failure to transcribe and produce these communications violated his right to due process. For reasons that will appear, we do not reach this argument.

The court rejected this argument as "disingenuous." (*Johnson v. Superior Court, supra*, 15 Cal.3d at p. 251.) "The grand jury cannot be expected to call for evidence of which it is kept ignorant. When a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he [or she] is obligated under section 939.7 to inform the grand jury of its nature and existence." (*Ibid.*)[15]

The same can be said about the People's argument in this case, in reliance on Penal Code section 934,[16] that the grand jury need only have asked for advice from the district attorney if it had questions about the instructions. "That the grand jury in the instant case did not request further instructions indicates it did not need desire [*sic*] additional advise [*sic*] or instructions. Consequently, it cannot be said that the lack of instructions resulted in prejudicial error."

However, what was missing here was not simply an explanation or clarification of an instruction that was given (although, for reasons discussed below, we believe that was a problem too), but any instruction at all about an essential element of the offense to be charged in the indictment. The grand jurors had no cause to suspect the instructions they had been given were incomplete, and so no reason to request additional ones. Therefore, the more plausible explanation for their silence is they assumed, as they were justified in doing under the circumstances, that they had been instructed on all the elements. They were, in other words, misled into believing there were no others when, of course, there were. As a result, the grand jurors were not called upon to decide whether Gnass acted knowingly and willfully.

*Backus* was an appeal by the People from an order setting aside an indictment on the ground, among others, that the prosecutor's presentation of inadmissible evidence to the grand jury, together with his failure to advise the grand jury that some evidence was admissible for only a limited purpose, was so prejudicial as to violate the defendant's right to due process. The People argued to the contrary in reliance on Penal Code section 939.6, subdivision (b), which at the time provided: "The grand jury shall receive none but evidence that would be admissible over objection at the trial of a criminal action, but the fact that evidence which would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury."

---

[15]This holding in *Johnson* was later codified as Penal Code section 939.71. (Stats. 1997, ch. 22, § 1.)

[16]Penal Code section 934, subdivision (a) provides in part: "The grand jury may, at all times, request the advice of the court, or the judge thereof, the district attorney, the county counsel, or the Attorney General. . . ."

Reasoning from *Johnson*, the court acknowledged that the conduct of grand jury proceedings may implicate due process. "If the grand jury cannot fulfill its obligation to act independently and to protect citizens from unfounded obligations [*sic*, accusation?] [citation] when not advised of relevant exculpatory evidence, neither can it do so if it is invited to indict on the basis of incompetent and irrelevant evidence. It follows therefore that when the extent of incompetent and irrelevant evidence before the grand jury is such that, *under the instructions and advice given by the prosecutor*, it is unreasonable to expect that the grand jury could limit its consideration to the admissible, relevant evidence [citation], the defendants have been denied due process and the indictment must be dismissed notwithstanding Penal Code section 939.6." (*People v. Backus, supra*, 23 Cal.3d at p. 393, italics added.) The court then concluded, however, that "[t]he nature and extent of the inadmissible evidence was not such that it may have compromised the independence of the grand jury and contributed to the decision to indict." (*Ibid.*) *Backus* is nonetheless significant for our purposes in that it recognizes grand jurors do not consider the evidence presented to them in a vacuum, but do so instead within the framework of the law as provided by the prosecutor.

This point was made more directly in *Cummiskey*, on review of an order denying the defendant's motion to set aside a criminal indictment charging her with murder. She challenged the indictment on three grounds, all of which concerned instructions or legal advice given or withheld by the prosecutor. Notably, the court considered the claims "[a]lthough the transcript of the testimony before the grand jury, on which the indictment was based, contains substantial evidence supporting a finding of probable cause that petitioner committed the crimes charged against her." (*Cummiskey, supra*, 3 Cal.4th at p. 1022; see also p. 1039 (conc. & dis. opn. of Kennard, J.).) Thus, it was in this context that the court explained an indictment may be set aside for instructional error, apart from whether it is supported by sufficient evidence. "Petitioner's chief assertion—that the grand jury was misinstructed on the minimum standard of proof required to indict—is manifestly tantamount to a claim that, as instructed, the jury may have indicted her on less than reasonable or probable cause. As such, the indictment was plainly subject to a motion to set it aside on that ground under section 995, subdivision (a)(1)(B). Moreover, petitioner's remaining claims are, in essence, grounded on the premise that the manner in which the prosecutor conducted the grand jury proceedings ran afoul of her due process rights under the relevant statutory and common law principles governing indictment by grand juries. Clearly, the Court of Appeal acted within its jurisdiction in entertaining petitioner's mandamus proceeding seeking relief from the trial court's denial of her motion to set aside the indictment under section 995. (See § 999a; 4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Proceedings Before Trial, § 2108, p. 2478.)" (*Cummiskey, supra*, 3 Cal.4th at p. 1022, fn. 1; see also pp. 1038-1040 (conc. &

dis. opn. of Kennard, J.).) The court then concluded, however, that none of the defendant's three objections to the grand jury proceedings warranted dismissal of the indictment.

First, the defendant argued the proceedings were fundamentally unfair because the prosecutor misled the grand jurors as to the applicable standard of proof for returning an indictment. She maintained the prosecutor should have instructed the jury using the language of Penal Code section 939.8: "The grand jury shall find an indictment when all the evidence before it, taken together, if unexplained or uncontradicted, would, in its judgment, *warrant a conviction by a trial jury*." (Italics added.) The prosecutor gave a similar instruction but replaced the italicized portion so the jury was told it should find an indictment if the evidence would " 'provide *sufficient cause* to believe that a public offense was committed and that the person accused was guilty of it.' " (*Cummiskey, supra,* 3 Cal.4th at p. 1025, italics added.) The court held the correct standard of proof under Penal Code section 939.8 is "probable cause"; that the "sufficient cause" instruction, in conjunction with a "strong suspicion" instruction like the one given in this case (see above), adequately conveyed the correct standard; and that there was sufficient evidence presented to the grand jury to warrant a finding of probable cause. (*Cummiskey,* at p. 1029.)

The defendant next contended, in reliance on *Johnson,* that the prosecutor had interfered with the grand jury's attempts to exercise its prerogatives under Penal Code section 939.7, which allows a jury to conduct its own investigation when it has "reason to believe that other evidence within [its] reach will explain away the charge." (*Cummiskey, supra,* 3 Cal. 4th at p. 1030.) Toward the end of the proceedings, the jurors asked several questions of the prosecutor that went to facts beyond the testimony they had heard, to which the prosecutor uniformly responded they should consider only the evidence that had been presented to them. This occurred some six and a half weeks after the superior court had instructed the jury under Penal Code section 939.7. The court found, under these circumstances, that the prosecutor had not misled the jury as to its statutory powers. Further, no showing had been made there *was* any undisclosed exculpatory evidence. (*Cummiskey,* at pp. 1029-1034.)

Finally, the defendant argued the prosecutor, by failing to give lesser included offense instructions, had misled the jury into believing it could not return an indictment for voluntary manslaughter (on the basis the defendant's drug intoxication had prevented her from forming the intent to kill). The court reiterated the long-standing rule that a prosecutor has no duty to instruct the grand jury sua sponte on lesser included offenses; that it is the

role of the trial jury, not the grand jury, to determine the degree of murder. (*Cummiskey, supra*, 3 Cal.4th at p. 1034.) The court then went on to explain this rule applies generally to mitigating defenses (which merely reduce the gravity or degree of the crime) but not to exculpatory defenses (which, if believed, result in no criminal liability). (*Id.* at p. 1036.)

It seems to follow that a prosecutor, at least if he or she undertakes to instruct the grand jury on the elements of the offense to be charged, must instruct on *all* the elements. Each is akin to an exculpatory defense in that there can be no criminal liability unless all have been proven.

In the course of this last discussion, the court cited *People v. Gordon* (1975) 47 Cal.App.3d 465, 474-475 [120 Cal.Rptr. 840] (hereafter *Gordon*) for the proposition there is no duty to instruct a grand jury on the law in the same manner a trial judge must instruct a petit jury. (*Cummiskey, supra*, 3 Cal.4th at p. 1034.) Following the denial of her motion to set aside the indictment, the defendant in *Gordon* was convicted by a jury of unlawfully soliciting a public official. She argued on appeal that her motion should have been granted because the prosecutor (1) failed to instruct the grand jury to draw no adverse inferences from her assertion of the privilege against self-incrimination, (2) failed to instruct that the public official must have been solicited to do an act in his or her official capacity, and (3) failed to adequately explain the intent required for the crime of solicitation. (*Gordon, supra*, 47 Cal.App.3d at p. 475.)

The court held none of these claims fell within the only two cognizable grounds for setting aside an indictment under Penal Code section 995: where the indictment "is not found, endorsed, and presented as prescribed in this code," or where "the defendant has been indicted without reasonable or probable cause." (Pen. Code, § 995, subd. (a)(1)(A), (B).) The court treated the second ground (the one discussed in *Cummiskey* and the one with which we are concerned) as simply a matter of substantial evidence, and it found without much discussion "there was abundant evidence to satisfy the reasonable or probable cause requirement for a valid indictment." (*Gordon, supra*, 47 Cal.App.3d at p. 475.) As for the first ground, the court said it applied generally to rules of pleading and procedure, which "contain no requirement that the deputy district attorney instruct the grand jury on the law in the same manner that a trial judge instructs a petit jury." (*Id.* at p. 476.)

More importantly, the court in *Gordon* then went on to say:

"An indictment cannot be attacked either under Penal Code section 995 or following a denial of such motion on appeal from a judgment of conviction

on the grounds that the grand jury was given insufficient or even inaccurate legal advice before returning an indictment.

"The legal sufficiency of the evidence which underpins an indictment is reviewed by a judge of the superior court at the time of the hearing on a motion under section 995 of the Penal Code. It is this check on the grand jury's power to indict that serves to protect a defendant against unmeritorious or legally incorrect indictments." (*Gordon, supra,* 47 Cal.App.3d at p. 476.)

Thus, according to *Gordon,* an indictment could be challenged under what is now Penal Code section 995, subdivision (a)(1)(B) only for the sufficiency of the evidence to establish probable cause. This is the ground (including the first part of the statement just quoted) upon which Justice Kennard, in her dissent in *Cummiskey,* argued the objections raised in that case were not cognizable under Penal Code section 995. (*Cummiskey, supra,* 3 Cal.4th at pp. 1038-1040 (conc. & dis. opn. of Kennard, J.).) And it is the same ground explicitly rejected by the majority, as we have discussed at some length above. (*Id.* at p. 1022, fn. 1; see also *Mouchaourab, supra,* 78 Cal.App.4th at p. 431.)

We have come then full circle back to where we began. Although a prosecutor does not have the same duty to instruct a grand jury as a trial judge does a petit jury (e.g., there is no duty to instruct sua sponte on lesser included offenses), an indictment may be set aside under Penal Code section 995, subdivision (a)(1)(B) "based on the nature and extent of the evidence and the manner in which the proceedings were conducted by the district attorney" (*Mouchaourab, supra,* 78 Cal.App.4th at pp. 424-425), including instructional error likely to have caused the grand jury to return an indictment on less than reasonable or probable cause. (*Cummiskey, supra,* 3 Cal.4th at p. 1022, fn. 1.)

The People argue the prosecutor's failure to instruct the grand jury on the section 1097 mental element of a criminal conflict of interest was harmless error. This is so, they claim, because the jury presumably would have asked for the instruction if they had felt a need for it. But, as we discussed above in connection with the Supreme Court's decision in *Johnson,* the jury cannot be expected to have asked for an instruction on a part of the law about which they knew nothing.

The People also claim it is irrelevant that the instructions were incomplete, as long as they did not misstate the law, because it was up to the trial judge who heard the Penal Code section 995 motion to determine whether

the evidence was sufficient to support the indictment. They rely for this argument on the passage quoted just above from *Gordon, supra,* 47 Cal.App.3d at page 476, to the effect that claims of instructional error are not cognizable under Penal Code section 995, subdivision (a)(1)(B). As we have already explained, that view has since been rejected by the Supreme Court in *Cummiskey.*

We understand *Cummiskey* to say we may consider the instructional error, along with the evidence and the manner in which the prosecutor conducted the proceedings, to determine whether the grand jury found the indictment on something less than reasonable or probable cause. We believe in this case that it did, for several reasons.

First, the district attorney also failed to instruct the jury about when a public official or employee may be said to have been acting in an "official capacity" (see, e.g., *Campagna, supra,* 42 Cal.App.4th at pp. 541-542); what it means to have "made" a contract in this context (see, e.g., *People v. Vallerga, supra,* 67 Cal.App.3d at pp. 868-869), and how to determine whether the public official or employee was "financially interested" in the contract (see, e.g., *Honig, supra,* 48 Cal.App.4th at pp. 315-319). For all the reasons we have explained up to now, these terms can mean something quite different, and much more expansive, than they do in ordinary usage.

At first glance, this might be thought to have worked to Gnass's benefit because the limited instructions that were given arguably held him to a higher standard than the statutes require. But that would have been true only if the contracts in question had been identified for the jurors to be the joint powers agreements. They were not. Indeed, the allegedly prohibited contracts were never identified at all by the district attorney from among the many that were made in the course of these complex bond transactions. This was reflected in the trial court's rhetorical comment: "Where is the contract?"

Moreover, the circumstances suggested the charges against Gnass were directed, not at the joint powers agreements, but at the disclosure counsel agreements he made with the Marks-Roos PFA's (directly or through Morris).[17] These were the only contracts actually "made" by Gnass in the conventional sense, and the only ones in which he had a direct financial

---

[17]Indeed, the People changed their position at oral argument to assert it *was* the disclosure counsel agreement, and not the joint powers agreement, that created the conflict of interest underlying each count of the indictment.

interest. If, as seems likely, the grand jury was looking to the disclosure counsel agreements, it would not have needed to decide whether Gnass, insofar as he participated in making the *joint powers agreements*, did so purposefully and with the knowledge he would be in a position to become disclosure counsel if they were made.

Second, as we have explained, the grand jurors evidently were confused about the distinction between the Waterford PFA and the Marks-Roos PFA's in terms of which entity issued the bonds, and by extension which of them hired the disclosure counsel. This confusion, in turn, permitted the grand jury to draw an inference of impropriety from the fact that the board members of the Waterford PFA did not know who the disclosure counsel was in many cases.

Third, the jurors' confusion is not difficult to understand given the complexity of the issues, the sheer volume of the documentary evidence, and the very limited amount of time the jurors took to consider it all. Over the course of approximately seven hours, the district attorney, in addition to six witnesses, presented 21 exhibits totalling 920 pages and Gnass's *Johnson* materials consisting of 130 more, all of which the grand jurors were given one hour to review. As one grand juror remarked: "Are you guys serious? Do you think I can get through this in one hour?"

The trial court, in granting Gnass's motion to set aside the indictment, expressed some concern about the short time the grand jurors had been given to review the *Johnson* materials. "[F]rankly, I have some serious doubts about whether or not they [the grand jurors] had an opportunity during that period of time [one hour] to review them [the *Johnson* materials]. . . . [¶] And going through those materials within an hour's time seems to me would have been totally inadequate to allow these grand jurors to determine whether or not those materials provided an adequate defense [under section 1091.5]."

The People argue this concern was not a sufficient basis upon which to set aside the indictment. We agree. But it is one of several factors that lead us to conclude the district attorney's failure to instruct the grand jury on the mental state necessary for a criminal conflict of interest under sections 1090 and 1097 requires the indictment against Gnass be set aside. Given the nature of the error, along with the other factors we have discussed, it is possible, if not likely, the grand jury indicted Gnass on something less than reasonable or probable cause.

Given our conclusion, we do not reach the other grounds advanced by Gnass for setting aside the indictment, all of which are variations of a single

theme: that the district attorney violated his constitutional rights to due process and equal protection by failing to transcribe and produce his opening and closing remarks to the grand jury (a variation of an issue left undecided in *Mouchaourab, supra*, 78 Cal.App.4th at p. 437).

DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Levy, J., concurred.